METCALF *vs.* VAN BENTHUYSEN.

A title to lands duly authenticated by written evidence will not be set aside on the assumption of a previous lost conveyance, except upon clear proof of the existence and execution of the supposed deed, and so much of its contents as will enable the court to determine the character of the instrument.

Parol proof in the case of a lost deed is admitted from necessity, but it must show the contents or the substance of the contents of the operative parts of the instrument.

Where the contents and loss of a missing deed are established, the parol declaration of the supposed grantor, it seems, is admissible as corroborative evidence of the execution and existence of the instrument; but such evidence of itself can not operate to confer a title or confirm one otherwise defective.

The supposed grantee in a lost deed entered upon the land which was wild and uncultivated, cut timber, ran the boundaries with a pocket compass, executed a conveyance to other parties, and then left the country. There was no other account of him, nor any evidence that he and the supposed grantor were known to each other. One of the persons to whom he conveyed testified, that at the time he exercised these acts of ownership, he saw in his possession a deed *purporting to be executed* by the supposed grantor to him, and this was the only evidence of the existence, genuineness and contents of the lost deed; *held* that the evidence was not sufficient to make out a defence in opposition to a hostile title clearly established by written evidence.

APPEAL from the supreme court. On the 6th of January, 1807, Barent Van Benthuysen purchased of the state of New-York a tract of land known as the state's one hundred acres on military lot No. 41 in the township of Hannibal, county of Oswego; and on such purchase he paid down a portion of the consideration money, gave his bond for the residue payable at a future time, and received from the surveyor general a certificate of the purchase in the usual form. On the 1st of July, 1839, he assigned the certificate to his son John Van Benthuy-

sen, the defendant in this cause, who on the 5th of the same month paid what was due to the state on account of said purchase, and obtained letters patent conveying to him the premises in fee. In July, 1840, John Van Benthuysen commenced an action of ejectment for the purpose of recovering the premises from David B. Metcalf who was in possession, and who thereupon filed the bill in this cause before the vice chancellor of the fifth circuit, for the purpose of restraining the suit at law, and procuring a conveyance to himself from the defendant of the legal title to the premises. The vice chancellor sustained the bill and decreed according to the prayer thereof. His decree was affirmed by the supreme court on appeal, and Van Benthuysen then appealed to this court. The facts under which the complainant Metcalf claimed the equitable title are sufficiently stated in the opinion of the court.

*Willis Hall,* for appellant.

*Charles Rhoades,* for respondent.

GARDINER, J. The legal title of the defendant to the one hundred acres in question is complete, and is sustained throughout by written evidence of the highest character. The complainant, however, by way of equitable defence, alledges that in 1807 or 1808, and while the father of the defendant was owner of the certificate of purchase, issued by the state for these premises, the former, for a valuable consideration to him in hand paid, sold and conveyed by deed in fee with covenants of warranty, the same land to one William Mead of Chenango county. That on or about the 14th of March, 1808, Mead, for the consideration of $200, conveyed in like manner with warranty, the premises to William Huff and Isaac Kinney, under whom the complainant claims title.

The execution and delivery of the deed to Mead, by the elder Van Benthuysen, is the principal question in the cause, and the only one I shall consider.

In March, 1808, a man calling himself William Mead, and

stating his residence to be in Oxford, Chenango county, entered upon this lot, cut some timber, and ran its boundaries with a pocket compass, executed a deed to Kinney and Huff, and immediately left the country.  During his stay in Oswego county, the witness Kinney saw in his possession a deed, purporting to be exe cuted by Van Benthuysen to Mead.  This is the only time the deed was ever seen, and the only account we have of the grantee. Kinney was the agent of Benthuysen, who resided in Warren county, and continued to reside there until his death.  There is no evidence, aside from the deed alledged to be lost, that the. parties to it were known to each other, or had any communication upon this, or any other subject ; and none that any man of the name of Mead, residing in Chenango or elsewhere, ever claimed to be owner of the lands in question, except that derived from his declaration to Kinney, on the occasion to which I have referred.  We are therefore thrown upon the testimony of Kinney exclusively, for evidence of the existence, and claim, of his grantor, and of the deed which was the evidence of his title.

If this witness, at the time of which he speaks, had in good faith purchased the land of his principal of a stranger, at an advance of more than fifty per cent over its cost the year previous, it would have furnished some evidence of his confidence in the title he was acquiring, if he had stated the amount of the consideration, and the time when, and manner in which it was paid.  Although the fact is put in issue by the pleadings, there is no evidence upon the subject whatever.

This witness was examined, upon a commission issued in the cause, in the state of Illinois.  The tenth interrogatory put to him is as follows: "Did you ever see a deed, or paper writing, *purporting to be a deed*, conveying the said state's hundred, executed by B. Van Benthuysen ?  If yea, to whom was it executed, the date thereof, the consideration expressed, the premises described, and was it executed by any one but Van Benthuysen ; did it contain a covenant of warranty ?  In whose possession did you see it ; was it under seal, and *acknowledged ?*  Declare *all you know* in relation to said deed."  In answer he says, I did see a deed executed by Barent Van Benthuysen, the date I do

Metcalf *v.* Van Benthuysen.

not know.   I saw the deed in March, 1808.   I don't recollect
the date or consideration ; the lot was described " as the state's
hundred acres, in the southeast corner of military lot number 41,
Hannibal." I *think* it was not executed by any one besides
Van Benthuysen.   I think it contained a covenant of warranty.
I saw the deed in possession of William Mead.   I *think* the
deed was acknowledged and under seal, and further I *know* not.

The answer of the witness in response to the interrogatory is
nothing more than that he saw what *purported* to be a deed
executed, which includes the entire instrument, in the hands of
Mead.   He was acquainted with the hand-writing of Van Ben-
thuysen, and yet he does not swear to his signature, or even to his
belief that it was his signature.   He recollects neither the date
nor consideration.   He *thinks* it was acknowledged, but gives
neither the year, or date of the acknowledgment, the name of
the officer or place of his residence, or one word of what, in his
judgment, would have constituted a legal acknowledgment.
He *thinks* there was a covenant of warranty, but is unable to
state a word of its contents.   He thinks it was under seal. · He
does not recollect, or profess to recollect, any thing but the name
of Van Benthuysen to a paper writing, purporting in his judg-
ment to be a deed.   Every word to which he has testified might
be true, if he had seen, in the hands of Mead, a contract for the
sale and conveyance with warranty of the land, on payment of
the purchase money, to which the name of Van Benthuysen
had been forged.   The witness professes to recollect and state
the description of the land.   This description, although suffi-
cient to embrace the lot in question, differs from that contained
in the certificate of the surveyor general, in the possession of
Van Benthuysen.   This was his only evidence of title, and ac-
cording to the usual mode of conveying lands would have been
copied into the deed executed by him to Mead.   In the certifi-
cate the land is described as "the parcel of land distinguished
as the 100 acres reserved out of the southeast corner of lot num-
ber 41 in the township of Hannibal, in the military tract, in and
by letters patent granting said lot."   Kinney gives the descrip-
tion as " the state's hundred acres in the southeast corner of

military lot No. 41, Hannibal." This was the popular designation of the tract, not 'the official description; such as a person acquainted with the premises could give, whether he had or had not any recollection of the language of the deed.

Secondary evidence of this character is admitted from necessity. But where the lost deed should accompany the possession, and ownership of the land, as an essential muniment of the title, no necessity will dispense with the proof by parol, of the contents, or substance of the contents, of the operative parts of the instrument. Chief Justice Marshall remarks, in *Taylor* v. *Riggs*, (1 *Pet.* 591,) that "the substance of the agreement ought to be proved satisfactorily, and if that can not be done, the party is in the condition of every other suitor in court, who makes a claim which he cannot support." There is nothing in the facts of this case to induce a relaxation of the rule. The existence of the deed to Mead, would not only convict the elder Van Benthuysen of a gross fraud, but the circumstances under which it was seen—the mode of taking possession of the land—the sale by warranty deed instead of an assignment of the certificate; the mystery which surrounds the grantee, and which subsequent inquiries have increased, instead of dissipating; the immediate sale to Kinney and Huff, so far as appears, without consideration, are all calculated to induce the belief, that if they did not know they were buying a pretended title, they had good grounds for suspicion.

They were at least guilty of gross negligence, in leaving in the hands of their grantor, of whom they knew nothing, the only evidence, such as it was, of his or their title to the premises. It is true that this witness swears, that in the fall of 1808, Van Benthuysen told him he had sold the state's hundred to William Mead. It is not pretended that he said any thing as to the mode of sale, whether it was by assignment, contract, quit-claim deed with warranty, or by parol.

If the contents and loss of the missing deed had been established, the declaration would be entitled to weight, as corroborative evidence of the execution and existence of the instrument in question. Of itself it can not operate to confer or confirm a

title otherwise defective, if proved by a witness disconnected with the transaction. But the declaration was made, if at all, by Van Benthuysen, after the supposed conveyance to Mead. It is sworn to by Kinney, thirty-six years afterwards, to sustain a title warranted as good by him, and which if fictitious, would materially affect his own character, and after the death of the only persons who could contradict him. Testimony in itself of the most uncertain nature, is not strengthened, in this case, by the position of the witness.

The possession of the plaintiff for a series of years, is the only fact that seems to require explanation. There is no evidence that the elder Van Benthuysen was ever in the county of Oswego, or knew of the occupation of the premises. For nine years after his purchase of the state, the lot was unoccupied. More than half of it is still uncultivated, and the lot upon two sides is bounded by lands still in the same situation. The complainant was the undoubted owner of eighty acres adjoining the land in question, and his actual occupation during the latter part of the time seems to have been upon this parcel. The elder Van Benthuysen resides in Warren county, was a man of wealth, and the owner of a large real estate. The legal title was in the state; and the holder of the certificate was authorized in the belief that without an assignment by him no one could acquire or impair his equitable right to the premises under the existing laws. (1 *R. S.* 203, §§ 26, 27, 28.)

On the other hand, the grantees of Mead all knew that their title depended upon a conveyance from the state, and thus the fact of such conveyance could be ascertained at the state offices at any time. No such inquiry was ever made. Kinney must have known that Van Benthuysen had only an equitable title, unless the latter, without any assignable motive, had practiced a deception upon his own agent.

The declaration of Van Benthuysen in the fall of 1808, volunteered to Kinney, according to his deposition, does not help the matter. Kinney must have understood the sale, then spoken of, to apply to the interest that Van Benthuysen held at the time, and not as an agreement thereafter to procure the le-

gal title.   Upon the whole, there is not enough in the evidence adduced by the complainant to impeach satisfactorily the title of the defendant.

I place my decision upon the ground, that a title to lands duly authenticated by written evidence ought not to be set aside on the assumption of a previous lost conveyance, except upon clear proof by the claimant of the execution and existence of the supposed deed, and so much of its contents as will enable the court to determine the character of the instrument. The complainant's proof falls short of this, and it is therefore unnecessary to consider whether the loss of the deed is shown satisfactorily.   In my opinion, the complainant, by neglecting to ascertain the residence and to make inquiries of Almy, terminated his search at the only point from which, if it had been vigorously prosecuted, there was a probability of its being successful.   It is unnecessary however to decide this question.

We think the decree should be reversed upon the ground suggested.

Decree reversed,