DOROTHY KNAPP, Plaintiff, v. ANN WAINWRIGHT PENFIELD (Also Known as MRS. FREDERICK COURTLAND PENFIELD) and Others, Defendants.

Supreme Court, New York County, March 17, 1932.

*Samuel Hoffman*, for the plaintiff.

*O'Brien, Malevinsky & Driscoll* [*Moses L. Malevinsky* of counsel], for the defendants.

HAMMER, J. This action is by plaintiff, an actress, for damages, compensatory and punitive or exemplary, for interference by the defendants with her contractual status resulting in her discharge. In 1923 the plaintiff was the winner of a national beauty contest for young women and awarded the title Miss America. Previously she had won a preliminary contest in this State and was awarded the title Miss New York. Miss America, a full figure statue in the nude, was sculptured by Howard Chandler Christie. Plaintiff " in bathing costume " was the model. Professionally her beauty has been exploited by advertisement and press agent in the reference to her as " the most beautiful girl in the world." Concededly, she is fair of face, form and figure.

Although so advertised and exploited, plaintiff does not give an impression of sophistication or calculating worldliness, but that of education, culture and refinement. Plaintiff testified that she had been featured in several sketches, but admitted she had never before starred or played a leading part in a musical show, nor as an actress had she done more than ordinary dancing, the singing of a mediocre number, or the speaking of a few lines in a feature act. It appeared that whatever she did as an actress was merely incidental to and afforded an opportunity for the exhibition of her attractiveness as a professional beauty.

The defendant Penfield, who has died since the trial of this action, an elderly lady over eighty years of age, of high social position, great wealth, and culture, the widow of a former United States Ambassador, was desirous of aiding the defendants Bagby and Johnson in promoting their reputations as musical composers. Through and in the name of her agent and *alter ego*, defendant Evelyn Hubbell, she entered into a contract with the defendant

Earl Carroll, the theatrical producer, to prepare, develop and produce the defendants Bagby and Johnson's musical compositions, among them the theme song to be sung by the heroine in the musical theatrical play "Fioretta." There were then four parties to the contract, the financier, the two authors and the producer. The contract (Plaintiff's Exhibit 3) provided that Mrs. Penfield would advance $250,000 to finance the preparation, development and production by Carroll. This amount with five per cent interest was to be repaid from but only in the event of net profits. Carroll received a salary of $1,000 per week. Bagby and Johnson were to receive royalties. The net profits, if earned, were to be divided in equal quarterly shares. Carroll's corporation, the defendant Vanities Producing Corporation, of which he was president but in which the others were neither officers, directors nor stockholders, was the agency, although not a party to the contract, used for the production of "Fioretta." Under a standard run-of-the play Actors Equity Association contract, plaintiff was employed by Vanities Producing Corporation, through Carroll, at a salary of $1,000 per week to play Fioretta Pepoli, the star role or leading part. Plaintiff was not equal to singing the theme song or dancing as the heroine's part was originally cast and the part was recast by Carroll to exhibit her physical attraction and beauty. Leading parts which were played by other stars at large salaries were accordingly required to support the recasted part of the heroine and were limited in the exhibition of their own talents. The defendant Hubbell, acting for Mrs. Penfield, protested that the role required a star who could sing and dance, and that plaintiff could not sing, dance or act up to the part and demanded that plaintiff be replaced by such star and other stars provided with appropriate parts. Carroll did not comply with the demand and Mrs. Penfield, through the defendant Hubbell, brought an action against Carroll for an injunction requiring him to replace the plaintiff by an artist equal to the part, alleging that for the purpose of serving his own personal ends and those of the said Dorothy Knapp he so constructed the whole performance that she might be featured in said play to her advantage, exploitation and glorification, and thus seriously impaired and jeopardized said Hubbell's (Penfield's) investment in the play. Thereupon Carroll discharged plaintiff but paid the balance of her salary under the contract and obtained another actress for the part. The play was not a financial success and there were no net profits.

It would seem under the circumstances that such defendants were acting within their own rights and did not wrongfully cause an injury to plaintiff. Procuring the breach of a contract in the

exercise of an equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong. A party to a contract ordinarily has the right to perform and to have same performed without interference by a non-party or stranger. Such interference, unless privileged, justified or excusable, is an actionable wrong arising out of the invasion of the party's right to freedom from interference with the contract and performance thereunder. Persons acting for the protection of contract rights of their own which are of an equal or superior interest to another's contractual rights may invade the latter with impunity. Mrs. Penfield's interest was equal and superior to the interest of the plaintiff. Her large financial investment provided not only the common enterprise of the four parties to the original contract out of which came their respective rights and obligations but also the employment of and benefit to plaintiff and other stars and numerous other persons. The continuance of the enterprise and of the benefits depended upon the success of the play without which the Penfield investment was lost. The right of the plaintiff was subordinate to that of said defendants, whose contract was paramount to plaintiff's. Without defendants' contract plaintiff would not have the employment under her contract with Vanities Producing Corporation. The very money which paid her agreed compensation arose out of defendants' prior agreement with Carroll. The performance or breach of the terms of the prior contract by the defendants imposed no obligation on and gave no rights to plaintiff. Any she had came from her contract of employment. The employment by Carroll, however, of an artist not equal to the heroine's role or part would be a breach by him of his prior agreement with the other individual defendants. The defendant Hubbell also had a financial interest in the play. She was to receive part of Mrs. Penfield's quarter of the net profits. By reason of that, in addition to her duty to Mrs. Penfield, her principal, she had a right to interfere which was privileged. The plaintiff's interest in her contractual status and her right to freedom from interference with her performance of the contract, therefore, were invaded with impunity by the defendants in protecting contract rights of their own which were of an equal or superior interest. Such interference was privileged, excusable and justified, and legal malice accordingly may not be assumed. While under the circumstances motives are unimportant, the evidence here shows no actual malice.

The plaintiff suffered no financial loss since she received all the money or compensation to which under the contract she was entitled. The right or interest of the plaintiff, if any, offended

expired, the cause of action shall not be deemed revived by an acknowledgment or new promise, unless the same be in writing, subscribed by the party to be charged thereby." In recommending this provision, the Commissioners declared: " * * * We have retained the substance of the English Act, though we have endeavored to condense its phraseology, without altering its spirit." (First Report of the Commissioners on Practice & Pleadings, [1848] p. 121.) A year later this provision, which did not affect acknowledgments made before the expiration of the limitation period, was extended to the full scope of the English statute, following its language closely and reading as follows: " No acknowledgment or promise shall be sufficient evidence of a new or continuing contract, whereby to take the case out of the operation of this title, unless the same be contained in some writing signed by the party to be charged thereby; * * *" (Code Proc. § 110; Laws of 1849, chap. 438.)

In 1876, on the report of the Throop Commission on Statutory Revision, the statute was reframed and embodied in section 395 of the Code of Civil Procedure, reading as follows: " An acknowledgment or promise, contained in a writing signed by the party to be charged thereby, is the only competent evidence of a new or continuing contract, whereby to take a case out of the operation of this title * * *." (Laws of 1876, chap. 448, § 395.) This section, practically unchanged, is now section 59 of the Civil Practice Act.

The defendant contends that there is a material difference between the statute of 1849 and that of 1876; that what was formerly a requirement of substantive law has now been made a rule of evidence, a rule of exclusion to be strictly and literally applied. I find no such radical difference in the two statutes. The revisers of 1876 clearly had no such change in mind. " It has been necessary," they wrote, " to subject nearly every section to some noticeable change in phraseology. * * * Accordingly, where the sole object of an amendment is to conform the syntax, or the terms used, to those of other portions of the bill, to prune down redundant expressions, or otherwise to attain greater simplicity and clearness, without material change of the meaning, the amendment has not been noticed in the table." (Report of the Commissioners to Revise the Statutes, 1876, p. 505.)

The amendment incorporated in section 395 of the Code of Civil Procedure was not included in the table attached to the report. The only inference to be drawn from such omission is that no " material change of meaning " was intended.

The defendant further urges that to allow secondary evidence

of the written acknowledgment or promise would be to subvert the statute; that it would let in all of the evils, the frauds and the perjuries which it was the policy of the law to shut out. The Statute of Frauds was enacted to prevent like mischief, yet secondary evidence of the contents of a lost writing has been held to be admissible thereunder. (See *Metcalf* v. *Van Benthuysen*, 3 N. Y. 424, 428; *Matter of Devoe*, 113 Iowa, 4, 10.)

The law is most zealous in prescribing the formal requisites of a will; no greater safeguards are thrown around the execution of any other instrument. Yet secondary evidence of a lost or destroyed will has always been held to be admissible. (*Harris* v. *Harris*, 26 N. Y. 433; *Matter of Kennedy*, 167 id. 163.) Where in an action to establish a lost or destroyed will, the Legislature desired a stronger quality of secondary evidence, it made specific provision therefor by statute. (Surr. Ct. Act, § 143.) " In the primitive medieval conception a document directly affecting rights of property or contract (as we should nowadays say) was looked upon as having in itself an extrinsic effect. Its physical, material existence was what counted, and nothing else." (Wigm. Ev. [2d ed.] § 1177.) Thus in 1402, in an action on a bond that was burned or lost, recovery was denied, the suitor being admonished " this would be deemed your own foolishness in not better keeping it." (Id.) The old notion that a lost document was a lost right disappeared from the law in the early 1800's. It is now the general rule that secondary evidence of any document is, under proper conditions, admissible. " The whole theory of secondary evidence depends upon this, that the primary evidence is lost, and that it is against justice that the accident of the loss should deprive a man of the rights to which he would otherwise be entitled." (*Sugden* v. *Lord St. Leonards, supra*, 238, per JESSEL, M. R.) If the Legislature, in dealing with the Statute of Limitations, had desired to change a rule so deeply ingrained in the law, it would have indicated its intention in clear terms.

The language of the statute, its history, its interpretation by the courts of England whence it was derived, and the construction placed upon other statutes having a similar purpose, all lead to the conclusion that a writing sufficient to extend the bar of the Statute of Limitations may, if lost or destroyed, be proved by secondary evidence. (See Wood Limitation of Actions, § 84.)

Motion for reargument granted, but on the reargument the original determination is adhered to.

Settle order.