**In the Matter of FARRELL PUBLISH-ING CORPORATION, Bankrupt.**

**In the Matter of W. J. SMITH PUBLISH-ING CORPORATION, Bankrupt.**

United States District Court
S. D. New York.
Aug. 12, 1958.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Cuneo Eastern, Press, Inc., of Pennsylvania. Samuel J. Silverman, William Josephson, New York City, of counsel.

Benedict Ginsberg, New York City, for trustee.

LEVET, District Judge.

Cuneo Eastern Press, Inc. of Pennsylvania (hereinafter referred to as "Cuneo") has petitioned this court for a review of substantially identical orders entered in each of the above-entitled proceedings on May 25, 1958, by the Hon. Herbert Loewenthal, Referee in Bankruptcy, insofar as these orders sus-

tain the claim of the Trustee in Bankruptcy herein for damages against Cuneo. Bankruptcy Act, 30 Stat. 545 (1898), as amended, 11 U.S.C.A. § 11, sub. a(10) (1952).

Before the Referee it was stipulated that the claims of both Farrell Publishing Corporation (hereinafter referred to as "Farrell") and W. J. Smith Publishing Corporation (hereinafter referred to as "Smith") against Cuneo should be treated as one and that all of the evidence, both oral and written adduced, be considered in connection with both matters.

Under the orders above mentioned, Cuneo was subject to a total liability of $100,000 ($50,000 to Farrell and $50,-000 to Smith) by virtue of Cuneo's allegedly tortious conduct in causing its attorneys to write a certain letter, dated February 3, 1954, to The Rumford Press (hereinafter referred to as "Rumford"). Against these sums, Cuneo was allowed the amount of $32,672.51 from Farrell and $23,191.25 from Smith. The letter written by Cuneo's attorneys to Rumford was as follows:

"We represent the Cuneo Eastern Press Inc. of Pennsylvania. Our client has entered into a contract with Farrell Publishing Corporation for the printing of the monthly magazine 'The Woman', which covers the printing of all issues of that magazine from September, 1953 issue through the August, 1956 issue. A similar contract has been entered into between our client and W. J. Smith Publishing Corporation with respect to the monthly magazine 'Everybody's Digest'.

"We have received information indicating that your Company is about to enter into contracts with the two corporations above named providing for the printing by your Company of 'The Woman' and 'Everybody's Digest'.

"We are therefore writing to inform you that any action on your part which induces, or which would induce a breach of our client's contracts with the above named corporations will be actionable interference with our client's contractual rights. In such event our client would hold your Company accountable for the damage and loss of profits that would inevitably result from such breach." (Exhibit 14.)

The general background with respect to this letter is as follows:

(1) On March 3, 1953, Cuneo entered into identical contracts with Smith and with Farrell in which contracts it was agreed that Cuneo would print "Everybody's Digest" for Smith and "The Woman" for Farrell for thirty-six consecutive months commencing September 1953. Cuneo printed the September through December 1953 issues and the January through May 1954 issues. (Referee's findings, p. 2; see Exhibits C and D.) By their terms these contracts were not terminable until each magazine's August 1956 issue had been printed.

Farrell and Smith were two closely allied corporations, controlled and dominated, it appears, by the same people and operated substantially as one business.

(2) From time to time the bankrupts complained to Cuneo about defective printing and late delivery and on January 22, 1954, Smith and Farrell sent substantially identical letters to Cuneo purporting to rescind these contracts because of Cuneo's alleged improper performance. (See Exhibit 13.)

(3) At substantially the same time Mr. Tom Farrell, the president of both bankrupts and of another corporation, "The Digest Group Inc.," entered into negotiations with Rumford for the printing by Rumford of "Everybody's Digest" and "The Woman."

(4) On January 26, 1954, Cuneo sent letters to Farrell for both Smith and Farrell corporations, among other things stating:

"Under the circumstances, we cannot recognize your attempted re-

scission of this contract and hereby notify you that we stand ready to fulfill the performance thereof.

"We shall, of course, hold you fully accountable for any damages and loss of profit that may be sustained in case you persist in this repudiation." (See Exhibit V, admitted by this court pursuant to Order 47 in Bankruptcy, August 11, 1958.)

On February 3, 1954, attorneys for Cuneo wrote and sent the letter (which is the subject matter of these claims) to Rumford. (See Exhibit 14.)

Farrell and Smith filed voluntary petitions in bankruptcy on May 24, 1954. Cuneo filed proofs of claim in the Smith case in the sum of $36,574.84, and in the Farrell case in the sum of $33,821.50. Subsequently, Cuneo received from Smith's and Farrell's distributor, The American News Company, credits which reduced the Smith claim to $23,191.25 and reduced the Farrell claim by credits to the sum of $32,672.51, or a total of both cases in the sum of $55,863.76. The Trustee moved to expunge both of these claims and counterclaimed against Cuneo for damages by reason of the letter hereinabove mentioned. (See Referee's findings, p. 2.)

The Trustee contended that Cuneo had breached its contract in certain respects. (See Referee's findings, p. 3.) After consideration of these claims of Cuneo, the Referee found that Cuneo was entitled to its full claim in the amount of $23,191.25 against Smith and the sum of $32,672.51 against Farrell, thus, in effect, concluding that Cuneo had not breached the Farrell or Smith contracts as the Trustee had contended.

On the claims of Farrell and Smith against Cuneo, the Trustee, apparently predicating his conclusions upon alleged interference by Cuneo with a contract between Farrell and Smith and Rumford, concluded that the letter (Exhibit 14) "was tortious in its nature to such an extent that it prevented Farrell and Smith from printing its magazines and forced them to suspend publication and virtually put them out of business." (Referee's findings, p. 7.)

Although the Referee found that the letter was a deliberate act on the part of Cuneo, he did state that: "I do not believe that it was written maliciously." He then found that "Smith was damaged in the sum of $50,000 by virtue of the tortious conduct of Cuneo and that Farrell was similarly damaged in the sum of $50,000 by Cuneo," (Referee's findings, p. 7) thus concluding that the Trustee in the Smith bankruptcy was entitled to $50,000 less $23,191.25, or $26,808.75 and that the Trustee in the Farrell bankruptcy was entitled to $50,000 less $32,672.51, or $17,327.49.

There is no finding by the Referee that on February 3, 1954, at the time when Cuneo sent the letter which is the basis of this claim (Exhibit 14) that it had no continuing contractual rights against the bankrupts. The only thing stated by the Referee in respect to this is: "There came a time when Farrell and Smith decided to act by letters terminating the contract between themselves and Cuneo (January 22, 1954, Tr. Ex. 13)" (Referee's findings, p. 5). What legal effect, if any, upon Cuneo's rights the Referee assumed these letters to have does not appear. However, the Referee, as stated, upheld the performance of the Smith and Farrell contracts by Cuneo, overruling all defenses of the Trustee based upon Cuneo's alleged breach of these contracts.

As to the status of any relationship between Farrell and Smith and Rumford which the letter in question may have interfered with, the Referee in his findings of fact states as follows:

"Farrell and Smith negotiated with Rumford Press of Concord, New Hampshire (S.M. 150).

"A copy of a letter from Rumford Press to Smith and Farrell was signed and returned to Rumford Press (S.M. 152, January 18, 1954 Tr.Ex. 54).

"Subsequent to the receipt of this letter by Rumford, Rumford Press actually started printing.

"Prior to the intervention by Cuneo, which I am about to describe Farrell and Smith sent to Rumford Press all of the editorial copy of 'The Woman' and 'Everybody's Digest' for the month of June, 1954, pursuant to the terms of the letter (Tr. Ex. 54) and Rumford Press billed their new customers Farrell and Smith for the work, labor, services, which they performed. They set all of the type and Rumford was ready for the presses." (P. 5.)

There is no express finding by the Referee as to whether or not Farrell and Smith had any binding contract with Rumford.

No legal basis is indicated to reveal what principles of law make Cuneo liable for sending the letter in question.

In order to consider the validity or invalidity of the result reached by the Referee, it is necessary, in my opinion, to examine into the fundamental question of the right of Cuneo to write the letter of February 3, 1954 under the circumstances existent at that time. Consequently, the first area of inquiry is: "What were the legal relationships of Cuneo with Farrell and Smith at that time?"

The pertinent facts as of February 3, 1954, were as follows:

(1) Cuneo's contracts with Smith and Farrell contained no provision for termination prior to completion of printing on the August 1956 issues of the magazines. (Exhibits C and D.)

(2) Cuneo had properly performed its obligations under the contracts. (Referee's findings, p. 4.)

(3) Smith and Farrell owed money to Cuneo for past performance. (Referee's findings, p. 7.)

(4) Smith and Farrell had given written notice of their intention to repudiate the contracts after completion of work on the May 1954 issues of the magazines. (Exhibit 13.)

(5) Cuneo had expressly notified Farrell and Smith of its refusal to acquiesce in a rescission of the contracts and had taken the position that it stood ready to fulfill performance thereof. (Exhibit V.)

(6) Cuneo's comptroller and sales manager had been informed by Tom Farrell that the magazines would henceforth be printed by Rumford. (S.M. 366, 368–369.)

(7) Cuneo had returned to Smith and Farrell certain plates necessary to the printing of the magazines and some copy on the June 1954 issues. (S.M. 381, 385–386.)

■ It, therefore, appears that on February 3, 1954, Cuneo had valid and subsisting contractual rights as against the bankrupts and that these rights were imperilled by the bankrupts' unwarranted anticipatory breach of their agreements with Cuneo.

The Trustee's contention that Cuneo acquiesced in a rescission of the contracts by returning certain plates and copy to the bankrupts is, in my opinion, untenable. There is not the slightest indication from Cuneo's conduct, either before or after returning the said material, that in any way indicates an abandonment by Cuneo of its rights under the contracts.

Apparently the Referee has predicated his determination on some possible interference by Cuneo with alleged contracts between Rumford and Farrell and Smith. In other words, Cuneo, attempting merely to preclude Rumford from inducing Farrell or Smith to breach contracts with Cuneo, is now charged with similar interference to the relationship of the bankrupts with Rumford.

The second area of inquiry is therefore: "What were the legal relationships of Rumford with Smith and Farrell?"

Robert E. Johnson, a salesman for Rumford, testified that he conducted negotiations with Tom Farrell with reference to printing of Smith's and Farrell's magazines by Rumford. (S.M. 683.) He stated that on or about Janu-

ary 9, 1954 he delivered to Farrell a memorandum which reads as follows:

> "Memorandum from H. E. Kimball
> "Date 1/8/54
> "To Bob Johnson
> "Subject The Digest Group
> "If Mr. Farrell wishes you to print his magazines, the following steps must be taken:
> "1. Get a clearance from present printer that his indebtedness has been completely cleared.
> "2. Get Blanket Assignment from Farrell covering all the publications we will be asked to print together with its acceptance from American News Company.
> "3. Get agreement in writing from Mr. Farrell that he will personally pay any amounts left unpaid after applying checks from American News Company.
> "4. Get written agreement from Mr. Farrell that on his change of printers he will assume complete responsibility and be charged by American News Company *for all returns* in connection with all issues prior to our starting printing. This is very important from Rumford's viewpoint.
> "HEK:bm" (Exhibit T)

Johnson testified that he told Farrell "those were the conditions of consummating any contract" (S.M. 691); that he reiterated this on January 21, 1954, when Farrell signed Rumford's letter agreement dated January 18, 1954 (Exhibit 54; (S.M. 695); and that to his knowledge the four documents mentioned in the January 8, 1954 memorandum had never been furnished. (S.M. 696.)

Johnson further testified that since the magazines had a publication date to meet, Rumford had agreed to go ahead with the printing pending Farrell's compliance with the foregoing conditions. (S.M. 696.)

Farrell, on the other hand, testified that he told Johnson he could not get a clearance from Cuneo and that Rumford "agreed to pass it up, and they went ahead without it." (S.M. 381.) Farrell further testified that the other three conditions "were cleared up to the satisfaction of the Rumford Press." (S.M. 377–378.)

 In my opinion the Trustee has failed to prove the existence of a valid and binding contract between the bankrupts and Rumford. At most, he has established the existence of a temporary working agreement, the continuance of which was contingent upon Farrell's fulfillment of certain conditions.

Farrell's testimony concerning his compliance with these conditions is negated both by Johnson's testimony and by a letter dated February 15, 1954, sent to Farrell by Rumford's attorneys (Exhibit 55.) This letter reads in part as follows:

> "Rumford considers that the accomplishment of these matters was and still is a condition precedent to any obligation upon Rumford to proceed with the printing and delivery of the two magazines under the memorandum of January 18–21. So far as I have been able to discover, none of these conditions has been fulfilled and there seems little likelihood that the first two can be fulfilled in the foreseeable future particularly in view of the fact that we were all advised on February 11, by the American News Company that it would not accept an assignment in Rumford's favor of moneys due or to become due from American News to you or any of your corporations from its sale for you or your corporations of the two magazines in question until such time as Cuneo Eastern Press Inc. released its blanket assignment and the partic-

ular assignments of said moneys which it now holds."

Under the circumstances herein, the imposition of liability upon Cuneo, in my opinion, is both unjustifiable in fact and unwarranted in law. Cuneo had contracts with Smith and Farrell extending through the August 1956 issues of "The Woman" and "Everybody's Digest." Cuneo's legal rights were threatened by a totally unjustified anticipatory breach of these contracts by Smith and Farrell. Knowingly or unknowingly, Rumford was facilitating this breach.

Under these conditions, Cuneo was not compelled to remain silent. Cuneo's rights were prior and superior to Rumford's in any event. As between Smith and Farrell on the one hand and Cuneo on the other, the former's rights to freedom from interference with their alleged contractual relations with Rumford were subordinate to Cuneo's rights to protect its own contract.

The law is clear that where a party acts to further its own advantage and has a present existing economic interest to protect such as a prior contract of its own, it is privileged to prevent performance of the contract of another which threatens it. Prosser on Torts, 2nd Ed., p. 737; Carpenter, "Interference with Contract Relations," 41 Harvard Law Review 728, 746–747; 4 Restatement of Torts, § 773; Knapp v. Penfield, Sup.Ct.N.Y.Co.1932, 143 Misc. 132, 256 N.Y.S. 41; Williams v. Adams, 1st Dept. 1937, 250 App.Div. 603, 295 N.Y.S. 86; Messine v. Continental Purchasing Co., 1936, 272 N.Y. 125, 5 N.E. 2d 62; Lawless v. Brotherhood of Painters, 1956, 143 Cal.App.2d 474, 300 P.2d 159. See, also, Tidal Western Oil Corp. v. Shackelford, Tex.Civ.App.1927, 297 S. W. 279, 280, 281; Quinlivan v. Brown Oil Co., 1934, 96 Mont. 147, 29 P.2d 374; Morrison v. Frank, Sup.Ct.N.Y.Co.1948, 81 N.Y.S.2d 743; Conway v. Skelly Oil Co., 10 Cir., 1931, 54 F.2d 11.

Knapp v. Penfield, Sup.Ct.N.Y.Co. 1932, 143 Misc. 132, 256 N.Y.S. 41, was an action for damages arising out of the defendants' alleged wrongful interference with plaintiff's contract to play the leading role in a musical comedy production. In directing a verdict for the defendants Hammer, J., stated:

"It would seem under the circumstances that such defendants were acting within their own rights, and did not wrongfully cause an injury to plaintiff. Procuring the breach of a contract in the exercise of an equal or superior right is acting with just cause or excuse, and is justification for what would otherwise be an actionable wrong. * * * Persons acting for the protection of contract rights of their own which are of an equal or superior interest to another's contractual rights may invade the latter with impunity." 143 Misc. at pages 134–135, 256 N. Y.S. at page 44.

Similarly, in Lawless v. Brotherhood of Painters, 1956, 143 Cal.App.2d 474, 300 P.2d 159, the court observed:

"'* * * If two parties have separate contracts with a third, each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract. Imperial Ice Co. v. Rossier, supra, 18 Cal.2d [33] at page 37, 112 P.2d 631. * * *'" 300 P.2d at page 162.

Implicit in the Referee's determination is the assumption that Cuneo could reasonably have foreseen Rumford's reaction to its letter of February 3, 1954.

It will be recalled that in its letter Cuneo put Rumford on notice that any action on Rumford's part which induces or which would induce a breach of Cuneo's contracts with Farrell or Smith would be actionable interference with Cuneo's contractual rights and that in such event Cuneo would hold Rumford responsible for damages and loss of profits that would result from such breach.

This letter does not state that if Rumford, without inducing a breach of the Cuneo contracts, enters into a contract with either Smith or Farrell it will be held liable. The caveat is limited to the conditions under which Cuneo might have a cause of action—that is, in the event Rumford induces or had induced Farrell or Smith or both to breach their contracts with Cuneo.

If Rumford had in fact induced Smith and Farrell to breach the Cuneo contracts, it could well fear a lawsuit by Cuneo. Under such circumstances the Cuneo letter was clearly justified and Rumford's reaction to it was quite predictable. However, in the absence of such inducement by Rumford, it had no reasonable ground to fear legal action by Cuneo and its subjective decision to sever relations with Smith and Farrell was not, in my opinion, a reasonably foreseeable consequence of the Cuneo letter.

The Referee concluded that the Cuneo letter was the proximate cause of Rumford's refusal to print for Smith and Farrell. This conclusion is based principally upon Farrell's self-serving hearsay testimony as to statements allegedly made to him by Rumford executives at an all-day conference in New York. (See Referee's findings, p. 6.) There were many reasons why Rumford might have wanted to discontinue its association with the bankrupts, including their financial instability and their failure to comply with the conditions laid down by Rumford as prerequisites to the consummation of a contract.

The Referee apparently further concluded that the Cuneo letter was the proximate cause of (1) Smith's and Farrell's inability to obtain another printer, and (2) the ultimate destruction of the bankrupts' business. (See Referee's findings, p. 7.)

There is not the slightest proof that Cuneo caused any other printer to decline to print either "The Woman" or "Everybody's Digest." There is not the slightest proof that any other printer saw the letter Cuneo sent to Rumford. Farrell testified that he made full disclosure of his situation with Cuneo to other printers and that they declined to bid on printing his magazines. (S.M. 171.) The printers may have had a number of valid business reasons for declining Farrell's business. What part, if any, the Cuneo letter played in their refusal is a matter of pure speculation.

Equally speculative is the Referee's assumption of a causal connection between the Cuneo letter and the collapse of the bankrupts' business. Both Smith and Farrell were insolvent prior to the time Cuneo started to print "The Woman" and "Everybody's Digest."

The annual news stand circulation of "Everybody's Digest" had declined from 1,973,000 copies in 1949 to 1,296,000 in 1953 (Exhibit 9, p. 4); that of "The Woman" had declined from 4,820,000 copies in 1945 to 1,375,700 copies in 1952 (Exhibit 12, p. 3). The advertising income of "Everybody's Digest" declined from $18,435.64 for the fiscal year ending April 30, 1952 to $12,710.70 for the fiscal year ending April 30, 1953. (Exhibit 11, "Exhibit B"; Exhibit 9, "Exhibit B".) The position of "The Woman" in the S*M Box Score (a rating apparently based upon circulation) declined from 75th in the last six months of 1950 to 88th for the last six months of 1952; the position of "Everybody's Digest" declined from 73rd for the last six months of 1950 to 87th for the last six months of 1952. (Exhibits 67, 69.) The percentage of news stand returns of "The Woman" had risen from 44.2% in 1946 to 52.7% in 1950 and to 54.2% in 1951. (Exhibit 12, p. 3.) [1]

It is clear from the foregoing that the financial condition of the bankrupts was precarious and that the position of their

[1]. In 1952 the percentage of returns dropped to 48.6%. However, 343,900 less copies of "The Woman" were consigned to the news stands.

magazines from a circulation standpoint was in a state of almost constant decline. A financial collapse appears to have been imminent. The Referee's assumption of a causal connection between this collapse and the Cuneo letter is, in my opinion, unjustified and erroneous.

In view of the foregoing, no purpose would be served in attempting an extensive analysis of the expert testimony adduced to establish the value, if any, of the bankrupts' magazines prior to the suspension of publication. James B. Kobak, a certified public accountant, fixed $125,000 as the value of "Everybody's Digest," "The Woman" and "The Working Press of the Nation," a yearly reference publication which operated at a profit. (S.M. 468.)

Julian S. Bach, an editor and publisher who had once been interested in buying "Everybody's Digest," estimated the value of that magazine in 1950–1951 as $100,000. (S.M. 518, 523.) He testified that he would have been willing to pay $100,000 for the magazine at that time, paying $50,000 in cash and $50,000 out of future profits. (S.M. 525, 527.)

On the other hand, George Romano, a financial consultant, testified that in his opinion "Everybody's Digest" and "The Woman" had no value since the magazines were operating at a loss. (S. M. 616, 617.)

The Referee concluded that on February 3, 1954 Smith and Farrell each had a value as a going concern. (Referee's findings, p. 7.) This is undoubtedly true. However, the Referee's apparent estimate of their value at $100,000 is, in my opinion, excessive.

Accordingly, the Referee's orders herein are modified by dismissing the Trustee's claim for damages against Cuneo resulting from the sending of its letter dated February 3, 1954 to Rumford. The Trustee's petition for review is in all respects denied.

So ordered.