Henry W. Lengyel, J.
On October 6, 1972, Thomas F. Hayes was an inmate of Brooklyn State Hospital. He had been admitted to the hospital on August 5, 1958, with a diagnosis of psychosis due to trauma-mental deterioration. His physical condition at the time of admission was ‘ ‘ quadriplegic. Fused left knee, right arm weak and with contractures.” Mr. Hayes’ committee paid the State $231 a month for room, board and care. His condition had not materially changed from the date of his admission to October 6,1972. One of the State physicians wrote in the Hayes ’ medical chart on February 19, 1971 that: ‘1 2He is suffering from left spastic hemiparesis consecutive of a car *499 accident. His left foot sustained a deformity and is fixed in equinirarus position. He is incontinent for feces and urine. His speech is very poor and slurred and is understood with difficulty. He is in very poor contact with his surroundings.” Similarly, on May 16,1972, another of the State physicians wrote in the hospital chart: “ Because of his physical handicap he sits in a wheelchair and requires nursing care and assistance. He is very untidy, at times he will wet himself and smear his feces. Most of the time he is cooperative and rational.” Thus, on October 6, Mr. Hayes presented a picture of a relatively helpless human being who was confined to bed and wheelchair; a being who was generally incontinent in his personal habits; a being who was essentially dysarthric; one who was generally co-operative and noncombative, except for brief spells of irritability ; and, a being who totally relied upon nursing and medical care for his very existence.
The claim herein alleged that Mr. Hayes was assaulted by a hospital employee on October 16,1972. The employee was identified during pretrial examinations of hospital personnel and records as Thomas Jackson. There were no witnesses to the incident which occurred between Hayes and Jackson.
Mr. Hayes was brought to the courtroom and sat slumped in his wheelchair in the spectators’ section of the courtroom during one morning. The court, on being advised that neither the claimant nor the 'State intended to call him as a witness, released iMr. Hayes and he was returned to the Montrose V. A. Hospital where he had been a patient since October 25, 1972. Mr. Jackson was no longer employed by the State and was not presented as a witness iby either party.
Of course, an adjudged incompetent may be called as a witness and after interrogration ,by court and counsel may, if determined reasonably competent, be sworn as a witness. (See Barker v. Washburn, 200 N. Y. 280, 283; People v. Resing, 14 N Y 2d 210, 213.) It was perhaps unfortunate, although from my observation of Mr. Hayes during a three-or four-hour period it was certainly .understandable, that counsel did not proffer Mr. Hayes as a witness. However, I have not made any inferences relative to the evidence on that ground.
As neither of the participants, Hayes nor Jackson, was called as witnesses; and, as there were no other eyewitnesses as to what had transpired, I had to rely upon the oral testimony of those who investigated the incident and upon entries in the hospital record and Jackson’s personnel record to reconstruct the events of October 6. It should be noted that claimant’s *500 counsel called as witnesses the three State doctors who were involved in the .aftermath of this incident, i.e., Dr. Wing To Li, Dr. Arthur S. Impastato, and Dr. Bernardo A. Mora, Jr. He also called Attendant Evelyn Sutton and Supervisor Emanuel Rucker to testify at the trial. The examination before trial of Head Nurse Rapeel Ramlall, the third employee with some knowledge of this incident, ¡was received in evidence as Exhibit “3”. State’s counsel objected to the oral testimony of these six witnesses ¡which related What Mr. Hayes .said to them relative to the incident; and, also objected to the receipt in evidence of written reports in the hospital record which reflected the investigations of the incident and the statements of Mr. Hayes. The State’s objection was primarily predicated upon Cox v. State of New York (3 N Y 2d 698). As I did not consider that the Cox decision applied to the facts at bar, the oral testimony was .permitted and the hospital record and Jackson’s personnel record entries were received in evidence. (See Kelly v. Wasserman, 5 N Y 2d 425; Toll v. State of New York, 32 A D 2d 47.) It should ibe noted that the State doctors and employees did not as a rule have clear and independent recollections of all that had occurred on October 6; and, that the entries in these records were the only truly accurate reflection of the events in question. At the most, -Mr. Hayes’ accusation of Thomas Jackson might be considered a self-serving statement, although, (given his .condition, such would appear to be most doubtful. However, as was stated in Bishin v. New York Cent. R. R. Co. (20 A D 2d 921, 922): “ The statute (CPLR 4518; former Civ. Prac. Act, § 374-a) renders admissible records made in the regular course of business; the statute makes no exception for records which also happen to be self-serving. It has been observed that the self-serving aspect of a record does not preclude its admissibility under the statute but is merely a consideration affecting the weight to be given to it (Publishers’ Book Bindery v. Ziegelheim, 184 Misc. 559).”
At .about 3:45 p.m., Attendant Evelyn Sutton was in the dressing room when she heard Mr. Hayes call out that he was hurt. She ran out to the hall but ■“ didn’t see anything unusual about him. Just a little redness on the face; just a little drop of blood trickling down by his lip. ” Mr. Hayes was sitting in his wheelchair and no one else was in the hall. Mrs. Sutton went to the treatment room and advised Head Nurse Ramlall of the situation. She requested him to examine Mr. Hayes.
Mr. Ramlall stated that, at about 4:00 p.m., one of the female attendants, Eveyln ¡Sutton, requested him to examine Hayes. *501 He observed that Hayes was sitting in his wheelchair and that blood was trickling from his mouth. Ramlall determined that Hayes had a small cut on the tip of his tongue, a small abrasion over his left eye plus a hematoma of the forehead. By this time others, besides Hayes, were in the hallway. He testified that Hayes pointed to Thomas Jackson and said “ He 'hit me. ” Mr. Jackson, however, told the head nurse that Hayes had fallen when he, Jackson, was assisting him from his bed to the wheelchair; and, that Hayes had been hurt in the fall. Jacksón signed an undated statement to the same effect. I noted that Mr. Jackson had not reported the alleged fall in which he stated Hayes ¡was injured; and that he left him alone in the wheelchair after he was injured. Why?
Ward ¡Supervisor Kucker advised the court that his independent recollection was somewhat “hazy” and referred to his written statement. Mr. Kucker testified that J ackson had gone on duty at 3:30 p.m. and that he had not noticed anything unusual about Jackson’s behavior when he signed in to duty. Despite this, Kucker called Head Nurse Ramlall at about 4:00 p.m. and directed 'him to check Jackson to see if he was ‘ ‘ functioning well in his duties. ” According to said report, Ramlall went to check on Jackson and then almost immediately reported to Kucker that Jackson was loud and abusive and allegedly had assaulted ¡Mr. Hayes. Kucker notified the doctors and safety personnel on duty and then went to Wand 53. He stated that Jackson definitely smelled of alcohol; and, that there was an ecchymosis under Hayes’ left eye. Mr. Hayes told Kucker that Jackson had punched him.
Dr. Impastato went to Ward 53 at about 4:30 p.m. He did not have an independent recollection of the October 6 incident. In his written report, he stated that Hayes told him that he, Hayes, had been struck and kicked ¡while in bed. Hayes identified Thomas Jackson as his assailant. Dr. Impastato then wrote: ‘ ‘ Mr. Thomas J ackson was interviewed. His eyes were injected. His speech was slightly slurred. His affect was labile. His mouth smelled of alcohol which was detectable from about six inches way. He was very angry when I told him I had to conduct an investigation. He threw the accident book on the table shouting, 1 You want to do me in. ’ He said he came on duty. As he was putting Mr. Hayes in the wheelchair he fell and hit the side of his mouth. He then wheeled him out to the corridor past the nursing station. * * * The patient was being sent to KCH for X-ray of the skull, etc. * * * Mr. *502 Jackson was suspended and advised not to step foot in a patient area.” It again should be noted that Jackson wheeled Hayes past the nursing station but did not report that Hayes had been injured.
Dr. ¡Mora examined Jackson at 4:30 p.m. on October 6. In his report, he stated that initially Jackson was very resistant and belligerent and refused to he examined. However, Jackson calmed down and the doctor performed a ‘ ‘ superficial examination ”. He noted that Jackson’s f ‘ speech was slurred, eyes appeared hazy .although pupils are equal and reacted to light and accommodation. Reflexes and coordination were within normal range. Mood iwas labile. There was some evidence of alchohol influence (alcoholic breath). No other findings noted. ”
The report of (Safety Officer Williams contained in Exhibit “ 2 ” reiterated that Jackson had odor of alcohol on his breath and that “ During questioning employee was loud, pulled books' out of bookcase, and threw them on the desk. ”
Dr. Li examined Mr. Hayes and found that he had sustained a % cm. superficial abrasion in the tip of tongue; a hematoma; about 3 by 4 cm., at left lower orbital area; a bruise on the left upper lid; a mild abrasion in the supraorbital area; and, a mild abrasion on the left forehead. Mr. Hayes was taken to Kings County Hospital for skull X rays which proved to be negative. His committee paid the Kings -County Hospital bill of $26.64. On October 10,1972, the bruises in the orbital area were fading and Mr. Hayes was in a comfortable condition.
It is my opinion, and I so find, that when Thomas Jackson reported for work on October 6,1972, he was under the influence of alcohol and in an emotionally instable condition. I find that he assualted Thomas F. Hayes by striking him in the face. Richard C.. Hayes, committee of Thomas F. Hayes, is awarded the compensatory sum of $526.64 for the assault, the injuries sustained by reason of the assault, and the Kings County Hospital bill.
At the close of the trial, claimant’s counsel moved to “ amend the wording of the Amended Notice of Claim to include a claim for punitive damages against the iState, not to increase the monetary amount demanded but to incorporate that into the Claim. ” I reserved decision on the motion. After an examination of the case law, I concluded that there was no necessity to amend the claim to bring the question of punitive damages before the trial court for determination; and, I now deny claimant’s motion. It was stated in Cornell v. State of New York (46 A D 2d 702, 703) that : “ punitive damages are merely an *503 element of the single total claim for damages and need not he set forth as a separate cause of action and as such need he neither pleaded nor proven separately. (See Ferrucci v. State of New York, 42 A D 2d 359, 362; Knibbs v. Wagner, 14 A D 2d 987; Gill v. Montgomery Ward & Co., 284 App. Div. 36, 41.)” (See, also Korber v. Dime Sav. Bank, 134 App. Div. 149.)
Having established that the amended claim at bar includes punitive damages as one of its elements, I shall now proceed to the question of whether punitive damages may be awarded against the State of New York; and, if that question is answered in the affirmative, whether claimant has presented sufficient factual evidence to support such an award.
State’s counsel, of course, contends that punitive damages may not be assessed against the State of New York and cites McCandless v. State of New York (6 Misc 2d 391, 395, revd. in part and mod. in part 3 A D 2d 600, affd. without opn. 4 N Y 2d 797). (See, also, New York Law of Damages, § 65, p. 55; and, 14 N. Y. Jur., Damages, § 184, p. 47.) Both of these texts support State’s counsel’s position on the authority of the McCandless decision in which the Trial Judge stated (p. 395): “ The State is not subject to punitive damages ”. However, in Eifert v. Bush (51 Misc 2d 248, mot. for rearg. den. 51 Misc 2d 500, mod. in part and as mod. affd. 27 A D 2d 950, affd. without opn. 22 NY 2d 681) it was stated by the Trial Judge at pages 500 and 501 that: “ It is, however, far from clear that punitive damages cannot be awarded against the State. Though the flat statement was made in the Court of Claims opinion in McCandless v. State of New York (6 Misc 2d 391) that such an award cannot be made against the State, no authority for the statement was cited and the point was not considered on appeal * * * since plaintiff apparently did not appeal. The point was also considered in Nephew v. State of New York (178 Misc. 824, 826) where it was stated that section 8 of the Court of Claims Act constitutes a waiver of sovereign immunity only to the extent of compensatory damage, but the authority of that holding is materially weakened by the fact that the court had already concluded that the facts of the ease did not justify punitive damages. The authority of both McCandless and Nephew .is put in doubt by the decision in Snyder v. State of New York (20 A D 2d 827) wherein the Appellate Division, Third Department, withheld decision of the question.” See, also, Michigan Mut. Liab. Co. v. State of New York, 53 Misc 2d 408, 409, 410, revd. on other grounds 31 A D 2d 780, affd. without opn. 25 N Y 2d 647.) The Appellate Division, Third Department, has considered this ques *504 tion on at least three occasions since the Snyder decision but has not, on the factual ¡situations presented, found it necessary to render a definitive decision on the point. (See Ferrucci v. State of New York, 42 A D 2d 359, 362; Johnson v. State of New York, 44 A D 2d 151, 152; and, Cornell v. State of New York, 46 A D 2d 702.) In Raplee v. City of Corning (6 A D 2d 230, 232 [4th Dept.]), it was stated that: “ The question whether a municipality may be held accountable for exemplary or punitive damages in the absence of statutory sanction is not free from doubt. ” But, in Mastrodonato v. Town of Chili (39 A D 2d 824, 825 [4th Dept.]), the court stated: “ There being no evidence that defendants employed unfit police officers or that they authorized or ratified any willful, wanton or malicious acts of such officers, assessment of punitive damages was not justified. ’ ’ (See, also, Baynes v. City of New York, 23 A D 2d 756 [2d Dept.].)
The United States 'Court of Appeals for the Second Circuit discussed the question of punitive damages in the case of Williams v. City of New York (Docket No. 74-1261, Nov. 1, 1974). In that decision Judge Smith wrote at page 210: ‘‘ Unlike compensatory damages, punitive damages are assessed to punish the wrongdoer rather than restore the victim. Accompanying this punitive function — and perhaps of greater significance, cf. Stevenson v. Hearst Consol. Publications, Inc., 214 F. 2d 902, 908 n. 2 (2d Cir.), cert, denied, 348 U. S. 874 (1954) — is a deterrent one, for the award of punitive damages is intended to deter repetition of1 the tortious conduct by both the particular defendant adjudged liable and others who might be tempted to imitate his conduct. See, Walker v. Sheldon, 10 N Y 2d 401, 404, 223 N. Y. S. 2d 488, 490 (1961); Costich v. City of Rochester, 68 App. Div. 623, 626, 73 N. Y. S. 835, 837 (4th Dept. 1902). The degree of misconduct needed to support an award of punitive damages against a municipality has been variously defined by the courts. As a general matter of New York law, however, the applicable standard calls for ‘ the intentional, wanton, willful or malicious commission of some illegal act or * * * such a perverse or obstinate failure to discharge .some duty as warrants the presumption of a reckless indifference to the rights of others which is equivalent to intentional misconduct. ’ Costich v. City of Rochester, supra, 68 App. Div. 623 at 626, 73 N. Y. S. 835 at 837. ” The Circuit Court affirmed an award of compensatory damages against the City of New York but reversed one of punitive damages. In so doing Judge Smith wrote at page 213: ‘ ‘ Without excluding the possi *505 "bility under New York law that punitive damages may be assessed against a municipality, we must recognize the difficulty of proving entitlement to such damages and the plaintiff’s failure in this case even to approximate the necessary proof. ” (Cf. Newcastle Prod. v. School Dist. of Blair Township, 18 F. Supp. 335; Hennigan v. Atlantic Refining Co., 282 F. Supp. 667.)
When the late Alfred E. Smith was Speaker of the New York Assembly, he engaged in a debate over labor legislation which required that women and children have one day’s rest in seven. He was opposed by Assemblymen who thought the legislation would :be detrimental to the cannery factories and who sought to exempt canneries from the legislation. His reply was ‘ ‘ I have read carefully the commandment ‘ Remember the Sabbath Day to keep it holy. ’ I am unable to find any language in it that says, ‘ except in the canneries. ’ ”[1] I do not intend to equate the Legislature or section 8 of the Court of Claims Act with the Holy Scriptures, although admittedly jurisdictional statutes will, at time, take on some of that aura. Section 8 reads: “ The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations ”. (See, also, N. Y. Const., art. VI, § 9; cf. H. S. Code, tit. 28, § 2674.)
I am unable to find any language in the State Constitution or in section 8 which says “ except in the instance of punitive damages. ” This being so, to hold that the State of New York is not subject to an award for punitive damages is to impress a judicial limitation upon the clear and unequivocal language of the Legislature. As stated in Tompkins v. Hunter (149 N. Y. 117, 122-123):
‘ ‘ In construing statutes, it is a well-established rule that resort must be had to the natural significance of the words employed, and if they have a definite meaning which involves no absurdity or contradiction, there is no room for construction and the courts have no right to add to or take away from that meaning. ” (See, also, Matter of Astman v. Kelly, 2 N Y 2d 567, 572; Le Drugstore v. New York State Bd of Pharmacy 33 N Y 2d 298, 302; Matter of Taylor v. Sise, 33 N Y 2d 357, 363.) The decisional law and the textbooks which seriously question the propriety of punitive damages being awarded against the State, or a municipality, generally predicate their *506 position on the ground of public policy. However, as stated in Matter of Steinberg v. Steinberg (18 N Y 2d 492, 497): “ The public policy of the State is what the Legislature says it is, where the Legislature has spoken ”. In my opinion, when the Legislature wrote “ The state hereby waives its imunity from liability and action” (Court of Claims Act, § 8), it made a ringing declaration of a far-reaching public policy which should not be circumscribed by judicial fiat. It seems crystal clear to this court that, under a factual situation which would support punitive damages against a private corporate body, such damages may be awarded against a public corporate body, be it the State of New York, a municipality, or an authority. In Soucy v. Greyhound Corp. (27 A D 2d 112, 113 [3d Dept.]), it was stated: “ while we find,no New York case directly in point, we find no constitutional barriers to the assessment of exemplary damages in civil proceedings. While an award of ■such damages is concededly punitive, it is in our opinion, in fact, a private .remedial remedy rather than a public criminal sanction * *. *. Moreover, while actual malice is a requisite to the allowance of punitive damages such may be established not only by showing ‘ that the tort was committed to gratify some actual grudge or ill will * * * [but also] by showing that it was committed recklessly or wantonly, i.e., without regard to the rights of the plaintiff, or of people in general. ’ (Magagnos v. Brooklyn Heights R. R. Co., 128 App. Div. 182, 183; 14 N. Y. Jur., Damages, § 179; see also, Smith v. Matthews, 152 N. Y. 152.) ” In the Soucy case the defendant was charged with pressing into service an extremely defective bus; and, of course, as a common carrier, its duty of care was of the highest quality. Are we to say that the State, municipal corporations, and public authorities, which undoubtedly operate more public transportation in this State than any private common carrier, should not be subject to the same rule of law? To so state would be repugnant to my sense of justice. I find that punitive damages maybe awarded against the State of New York.
Although Costich v. City of Rochester (68 App. Div. 623, 631) stands for the proposition that punitive damages may be awarded against a municipal corporation under very extraordinary circumstances, Judge Hiscock presented forceful and tightly reasoned arguments, generally based upon “ public policy ”, in opposition to “ the application of the doctrine of punitive damages to municipal corporations ”. However, Gostich was written in 1902, well before the original waiver of immunity statute provided by chapter 467 of the Laws of 1929. (See *507 Jackson v. State of New York, 261 N. Y. 134, 137.) Furthermore, the Gostich decision and the decision of Nephew v. State of New York (178 Misc. 824 [1942]), which was also based on 1‘ public policy”, were writen before the State had so pervasively invaded almost all sectors of human endeavor. When one considers the myriad of activities perf ormed by State agencies, by public authorities, and by municipal corporations, it seems obvious that a punitory award will deter irresponsible and reckless performance of duty on the part of those in responsible and leading executive and administrative positions. Such action is in the interest of the residents of this State who have day by day contact, in dozens of ways, with these public bodies; or, to write it more succinctly, is in the interest of “ public policy ”. It was of interest to read in Restatement, Torts (§ 908, p. 555) that “ In the earliest cases in which punitive damages were allowed, the plaintiffs suffered no substantial harm, or at least no physical or financial harm appeared. These were cases where public officials were guilty of outrageously oppressive conduct. ”
On July 28, 1970, Thomas Jackson was introduced to Frank Garey, Personnel Director of Brooklyn State Hospital by a letter from Dr. A. B. Greig who was on the hospital staff. Dr. Greig advised Mr. Garey that Jackson had been a patient on the Alcoholism Rehabilitation Unit (April 28, 1970 — July 30, 1970) and was interested in working as an attendant at the hospital. He further advised Garey that Jackson had previously worked for the Brooklyn Union Gas Co. and the Transit Authority, and that he £| was forced to resign from both jobs because of his excessive drinking. ”/ Dr. Greig finally wrote: “We recommend him highly for employment, as we feel that he would be a diligent worker, provided that he continue to maintain his sobriety, by attending A.A. and group therapy meetings on a regular basis. ” Jackson possessed a high school diploma and an honorable discharge from military service. Hamilton A. Harriss, a duly appointed officer of Brooklyn State Hospital, signed an affidavit on January 19, 1973, wherein he stated that, “ Through various preliminary interviews prior to Mr. Jackson’s appointment ” to Brooklyn State Hospital, he had learned of the facts stated in the Greig letter. Thus, there is absolutely no question that at least two officials at Brooklyn State Hospital knew of Jackson’s alcoholism problem prior to the hospital employing him as a Mental Hygiene, Theraputic Aide. On February 16, 1971, Supervising Investigator Grossman of the New York State Department of Civil Service wrote to Dr. *508 Morton Wallach, Director of Brooklyn State Hospital, attention of Frank Garey. He advised that on November 13, 1965, Jackson had been found guilty of driving- while intoxicated; and, that on July 28, 1967, he had been arrested for driving while intoxicated, for being an unlicensed operator and for driving an unregistered vehicle. Jackson was indicted for intoxicated driving as a felony. He pled guilty to driving while intoxicated, a misdemeanor. The Civil Service Department inquired whether Jackson had admitted the arrests on his employment application; and, if not, requested the hospital to advise the reason for the failure to show the arrests together with an opinion and/or recommendation regarding suitability for retention. Although Jackson checked “no” after the employment form question, “ Have you ever been arrested for any violation of law (except minor traffic violations) ”, (italics added), there was no reply to the Department of Civil Service in his personnel file. In any event, on February 16, 1971, the office of the Director of the hospital was reminded of the alcoholism problem and was alerted to a false statement on the employment form which, incidentally, provided on its face that “ False statements may be grounds for dismissal. ”
On August 6, 1971, Jackson was intoxicated while on duty in Ward 53. Supervisor Kueker reported in a memorandum to Dr. Chiarello, the 'Chief of Division IV, that, at 6:15 p.m., Evelyn Sutton informed him that Jackson was not able to function because of alcoholic intoxication. Kueker spoke to Jackson and determined that his “ breath reeked very strongly of alcohol.” Kueker told Jackson to leave the ward and when he refused Kueker went to the telephone to call a doctor. In his report, he stated that Jackson tried forcibly to restrain him from making the call and pushed him around. Mrs. Sutton helped “ disengage ” Jackson from Kueker and he then telephoned for assistance. I note that Evelyn Sutton testified under oath that she had never known Jackson to come to work intoxicated and that she had never seen him strike a fellow employee. The doctor who examined Jackson noted he was a former patient in the alcoholic service. He wrote that his breath smelled strongly of alcohol and his eyes were injected. Dr. Chiarello interviewed Jackson on August 9. He admitted that he had been drinking that morning but denied assaulting or attacking Kueker. However, on August 11, Mr. Kueker wrote an [1] ‘ employee counselling summary ” in which he stated: “Mr. Jackson went berserk and assaulted me. ” Nothing further was done by the hospital administration.
*509 On September 10, 1971, Mrs. Benton, a female attendant, complained that Jackson molested and harassed her while on a hospital elevator. Mr.. Contento, the over-all Supervisor, was called and he noted that Jackson “ smelled of alcohol, his speech was slurred and he was unsteady on his feet. ’ ’ Mrs. Benton filed a statement in which she wrote that Jackson pushed, pulled, hit her, and used vulgar language to her before she got on the elevator; that he went into the elevator with her and molested her; and, that when the elevator stopped he pulled her off it and “started all over again. * * * p.g. j don’t think he realized what he was doing.” Jackson was on the 3:30 p.m. to 11:30 p.m. shift on September 10 and the Benton incident occurred about 6:50 p.m. Dr. Chiarello interviewed Jackson again. He determined from Jackson, but not from‘Mrs. Benton, that Mrs. Benton was a “very close girlfriend” and that this action was a “horsing around ”. He advised Frank' Carey, the personnel director, that ‘‘ Apparently, this employee has an alcohol problem which makes him asocial when intoxicated.’^ Dr. Chiarello pointed out to Jackson that if he were brought up on disciplinary charges he would lose his job. He suggested that Jackson take his accumulated time off and go to A.A. and advise the hospital authorities that he was “ trying to take care of your problem. In that way, we 'will try to keep you on the job.” On October 5, 1972, Jackson was “ abusive to Mr. Charles Walcott, the Head Nurse in charge at Division TV, Mr. Jackson’s place of work ” and, on October 6 the incident, which is the claim before this court', occurred. Mr. Kucker wrote two “employee counselling summaries which were included in Exhibit “ ;2 In one of them he wrote that, “ The problem of Mr. Jackson is weakness for alcohol and resulting change of behavior pattern as a result.” He then advised: “ The problem was discussed on 8/6/71 again on 9/10/71 and numerous times since', then including just last eve and, that “ Mr. Jackson in spite of these discussions apparently did not profit at all by them.”
It has been stated that punitive damages may be awarded, against a principal who knew that an agent was unfit when employed and the principal was reckless in employing him. (Restatement, Torts, § 909; Restatement, Agency 23, § 217 C. See, also, Mastrodonato v. Town of Chili, 39 A D 2d 824, 825.)
In my opinion, Mr. Jackson was not a fit person to be hired as a “ Therapeutic Aide ” and the State hospital officials took a calculated risk with the safety and well being of helpless patients when they hired him. I realize that a person who suffers from *510 the disease of alcoholism and who is trying to conquer that disease should not be out off from employment. However, Brooklyn /State Hospital existed, or should have existed, for the benefit of its patients. It does not appear seemly for the patients to provide therapy for the attendants. If Jackson had been hired to work out of the patient areas that would have been acceptable; but, to hire him to work in the sensitive area of patient care with full knowledge of his problem was, in my opinion, reckless conduct on the part of the employer. To continue him in this sensitive area after one recorded instance of alcoholism on the ward, compounded the recklessness; and, after the second recorded instance of alcoholism on the ward, recompounded the recklessness. I do not believe that the State should conduct its employment practice on a “ three strikes and you are out ” basis. I realize that the two recorded instances of alcoholism were brought to light, and to the written record, because of abuse and minor assaults on co-workers. However, as the night follows the day, something was bound to involve a patient, and it did. It is fortunate that Mr. Hayes’ injury was not severe.
I find that an award should be made against the State of New York for punitive damages in the sum of $5,000. Claimant is awarded the total sum of $5,526.64.
I reserved decision on the State’s motions to dismiss. These motions are denied.

. The Power Broker, Robert A. Caro, p. 124.