**FURY IMPORTS, INC., Plaintiff-Appellant Cross Appellee,**

v.

**SHAKESPEARE COMPANY, Defendant-Appellee Cross Appellant.**

No. 75-2421.

United States Court of Appeals, Fifth Circuit.

June 24, 1977.

Rehearing Denied Aug. 22, 1977.

Kenneth L. Ryskamp, Miami, Fla., Edward S. Corlett, III, Miami, Fla., for plaintiff-appellant cross appellee.

John L. Britton, Miami, Fla., for defendant-appellee cross appellant.

Before COLEMAN, MORGAN and HILL, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

In this diversity suit for tortious inducement to breach a contract, plaintiff Fury Imports, Inc. appeals from a judgment notwithstanding the verdict entered in favor of defendant Shakespeare Company setting aside a jury verdict of $2,946,872.35. Defendant cross-appeals. We reverse and remand for a new trial.

## I. FACTS AND PROCEEDINGS BELOW.

Although many of the facts and inferences to be drawn from them are hotly disputed, the bare bones of this case are as follows. William Ciaccia designed a new fishing reel called the "Spinmaster" and, in 1969, he incorporated Fury Imports in New York to market it. On December 15, 1969 Fury entered a three-party contract with a Japanese manufacturing company, Omori, and its trading agent, Shinei Company. Under this contract, Omori was to produce the reels. Fury was to purchase the reels from Omori through Shinei, which was to act as Omori's distributor. The contract provided that Fury would have exclusive distributorship rights for the reel in the Western Hemisphere, Omori in Japan, and Shinei in the rest of the world.

Under the contract, Fury and Shinei were to place orders for an aggregate of at least 150,000 reels during the first year of the contract.[1] The period for which the contract was to be in effect was set forth in the following paragraph:

This agreement shall remain in effect for a period of one year from the date hereof and shall continue in effect from year to year thereafter, provided that Fury and/or Shinei shall place orders for at least 150,000 additional units of the products during the first year hereof or any renewal year, as the case may be, for delivery during the succeeding year.

App. 1089. It is not disputed that Fury did, in fact, order 150,000 reels from Omori, through Shinei, during the first year of the contract. Something less than this number was actually delivered to Fury for the 1970 retail season.

Fury was not the only company for which Omori manufactured fishing reels. Since 1963, it also had made reels for the Shakespeare Company, a large sporting goods company incorporated in Delaware. Fury and Shakespeare were competitors in at least some American markets to sell fishing reels.

There was evidence that Omori experienced financial difficulty in 1969–70, although the cause of that difficulty was disputed.

This case arises out of a meeting in Japan on June 10, 1970 between officials of Shakespeare's wholly-owned overseas subsidiary, Noris-Shakespeare, and Mr. Omori, president of the Omori company. At this meeting Shakespeare and the Omori company entered an agreement by which Shakespeare bought one-sixth of the stock in Omori for about $25,000 and was given the right to place a Shakespeare representative on Omori's board of directors. Shakespeare also made a $200,000 interest-free loan to the Omori company. The critical portion of this agreement, as far as Fury is concerned, was a provision that Omori would stop making Spinmaster reels for Fury within one year and would start making a similar reel for Shakespeare.[2]

In the years after 1969–70, Omori delivered fewer and fewer reels to Fury. Finally, in 1973, Omori informed Fury that it would no longer make any Spinmaster reels at all for it.

On January 15, 1974 Fury filed this suit against Shakespeare, alleging that Shakespeare had tortiously induced Omori to breach its 1969 contract with Fury.[3] The theory of Fury's case was that Shakespeare had bought into Omori and made it a sizea-

1. The contract states:

Fury and, with respect to sales under Paragraph 'THIRD' hereof, Shinei shall place orders with Ohmori for such quantities as in the discretion of Fury and Shinei each may require from time to time. Fury and Shinei shall place orders for an aggregate of at least 140,000 of the products during the first year hereof. The purchase price, terms of payment, terms of shipment and other terms of sale shall be mutually agreed upon by Ohmori and Fury, or by Ohmori and Shinei with respect to sales under Paragraph 'THIRD' hereof, as set forth in each separate confirmed purchase order or sales order.

App. 1088–89. At about the same time Fury entered this contract with Omori, it entered a contract with Southern Tackle Distributors, a Florida corporation, under which Southern agreed to buy 150,000 Spinmaster reels per year from Fury.

2. The agreement provided:

Omori currently manufactures a family of reels for the Japanese export company Shinei under the brand 'Diamond Spinmaster'. It was agreed upon that within a year from now Omori will stop further supplies to this outlet and give up the production of these reels. To fill a possible production gap, the US Shakespeare company and Omori will start immediately to create design and develop a most up-to-date series of fishing reels similar to the current Diamond Spinmaster to be distributed worldwide by NST . . . .

App. 1030–31.

3. The complaint as originally brought was against Shakespeare and Southern Tackle Distributors for an accounting, on allegations that Shakespeare had bought Spinmaster reels directly from Omori and sold them to Southern, in violation of Fury's exclusive distributorship rights under the Omori-Fury contract. Fury amended the complaint to include the tortious inducement count after discovery unearthed the terms of the June 10, 1970 agreement between Omori and Shakespeare. Southern was dismissed as a defendant, a ruling that Fury does not appeal. Neither do we have before us any question concerning the action for accounting against Shakespeare.

ble interest-free loan on the condition that Omori would quit making Spinmaster reels for Fury, with the purpose of eliminating Fury as a competitor to Shakespeare in the market to sell fishing reels. Fury sought compensatory and punitive damages.

Shakespeare's trial defense had two main prongs. First, it claimed that in the years after 1970 there was no contract in existence between Fury and Omori, so that it could not have induced any breach. This claim, in turn, rested on the theory that the Omori-Fury contract had not been renewed for the years after 1970. Shakespeare's second line of defense was that its purpose for buying into Omori, making it the loan, and requiring that Omori stop supplying reels to Fury, was to save Omori from bankruptcy and preserve it as a steady supplier of reels to Shakespeare. This line of defense was put under variations on the "privilege" or "justification" defense to an inducement-to-breach suit.

The case was tried to a jury under an unwritten stipulation by the parties that New York law would apply. The jury returned a special verdict, printed here in the margin.[4] After the verdict was returned, Shakespeare, which had moved for directed verdicts at the close of plaintiff's evidence and at the close of all the evidence, moved for judgment notwithstanding the verdict on a number of grounds.

The district court granted Shakespeare's motion in a written order on the grounds (1) that the evidence did not establish the

---

4.
1. Did the defendant Shakespeare know that the contract among the plaintiff, Ohmori Corporation and Shinei Corporation dated December 15, 1969, was in full force and effect in June, 1970?

Yes __X__        No _____

2. Was the contract extended through the year 1971 by the placing of orders for that year with the Ohmori Corporation for at least 150,000 units of the spinning reel in question?

Yes __X__        No _____

3. Was the contract extended for the year 1972 by the placing of orders for that year with the Ohmori Corporation for 150,000 units of the spinning reel in question?

Yes __X__        No _____

4. Was the contract extended for the year 1973 by the placing of orders for that year with the Ohmori Corporation for 150,000 units of the spinning reel in question?

Yes __X__        No _____

5. Did the Ohmori Corporation exercise a lawful right by refusing to manufacture spinning reels for the plaintiff by reason of the failure of the plaintiff to comply with the terms of the contract?

Yes _____        No __X__

6. Did the Ohmori Corporation breach its contract with the plaintiff by wrongfully refusing to manufacture the spinning reels in question for the years in which the contract was in full force and effect?

Yes __X__        No _____

7. If your answer to Finding 6 above is yes, was the breach by the Ohmori Corporation of the said contract proximately caused by the defendant, Shakespeare Company, inducing the Ohmori Corporation to refuse to manufacture the reels?

Yes __X__        No _____

8. If your answer to Finding 7 above is yes, was the defendant, Shakespeare Company justified in inducing the breach of contract?

Yes _____        No __X__

9. If your answer to Findings numbered 1, 6, and 7, and any of 2, 3, and 4 is yes, and your answer to numbers 5 and 8 is no, state the amount of any compensatory damages sustained by the plaintiff in each of the following years:

| (a) | 1970 | $35,278.88 |
| (b) | 1971 | $42,376.67 |
| (c) | 1972 | $206,818.92 |
| (d) | 1973 | $423,523.20 |
| (e) | 1974 (thru September 25) | $563,319.68 |
| | TOTAL: | $1,271,317.35 |

10. If your answer to Findings numbered 1, 6, and 7, and any of 2, 3, and 4 is yes and your answer to numbers 5 and 8 is no, answer the following question. Was the defendant Shakespeare Company guilty of wanton, willful misconduct in effecting such breach?

Yes __X__        No _____

11. If your answer to number 10 above is yes, please insert the amount of punitive damages below.

$1,675,555.00

SO SAY WE ALL.

existence of a contract between Fury and Omori for the years 1971, 1972, or 1973; (2) that the jury's finding of no justification was against the manifest weight of the evidence or was based on no evidence at all; (3) that compensatory damages had not been proven with sufficient precision; and (4) that the evidence did not support an award of punitive damages. The court rejected Shakespeare's argument that the action was subject to the three-year New York statute of limitations, rather than the four-year Florida statute of limitations, and hence was barred. In addition to the grant of judgment notwithstanding the verdict, the court recited that, "Shakespeare's motion for a new trial is granted in accordance with the result reached in [the portion of the order dealing with proof of compensatory damages]—but this recital is, of course, for purpose of the record only."

Fury appeals, arguing that the district court's grant of judgment notwithstanding the verdict constitutes an unwarranted invasion of the jury's province as fact finders. Shakespeare opposes this contention and, in addition, cross-appeals. On its cross-appeal it argues that the district court erred in holding Fury's action was not barred by the statute of limitations; that it erred in ordering that each party bear its own costs; and that, if we reverse the district court's judgment notwithstanding the verdict, a new trial should be held on all issues.

For the reasons that follow, we have decided that the district court erred in granting judgment notwithstanding the verdict on the issues whether the Fury-Omori contract was in existence in the years 1971, 1972, and 1973, whether the justification defense was available, and whether punitive damages were available. We also have decided that a new trial is required on the issue of compensatory damages. Because that issue is so intimately intertwined with

the issue of liability, however, justice requires that a new trial be held on all issues. Finally, because the record is not sufficient for us to decide the statute of limitations issue, we remand that issue to the district court for further consideration.

## II. ISSUES CONCERNING LIABILITY.

As we have said, the district court granted judgment notwithstanding the verdict on the issues whether the Fury-Omori contract was in existence in the years 1971, 1972, and 1973, and whether the justification or privilege defense was available. In reviewing these holdings, we must

consider all the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc). We hold there was sufficient evidence to present a jury question on each of these issues.

■ A. *Proof of Continued Existence of the Fury-Omori Contract.* Under New York law, the elements of a cause of action for inducement to breach a contract are (1) the existence of a valid contract; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach of that contract; and (4) damages. *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956).[5] In this case, the court instructed the jury that the Fury-Omori contract was in existence for the period from December 15, 1969 to December 15, 1970. App. 1004. It gave to the jury the question whether the contract was in existence in 1971, 1972, and 1973. This question turned on whether Fury had renewed the contract for those years.

---

**5.** Under New York law, "Malice, in the sense of intending actual harm because of spite or ill feeling is . . . not a requisite to the tort of inducing breach of contract . . . Knowledge of the existence of the contract is enough and implies malice." *American Cyanamid Co.*

*v. Elizabeth Arden Sales Corp.,* 331 F.Supp. 597, 608 (S.D.N.Y.1971); *accord, e. g., A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 376, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957); *Aljassim v. SS South Star,* 323 F.Supp. 918, 924 n. 12 (S.D.N.Y.1971).

The contract's renewal clause, quoted in its entirely in Part I above, provides that the contract "shall continue in effect [for years after 1970], provided that Fury . . . shall place orders for at least 150,000 additional units of the product during [1970] or any renewal year, as the case may be . . . ." The district court instructed the jury, "that in order to find that a contract existed during each of the succeeding years subsequent to December 15, 1970, you must find that orders were . . . placed with the Ohmori Corporation *and accepted by such corporation* in an amount not less than 150,000 units for each of the years in question." App. 1005 (emphasis added). It also instructed that, "the word 'accepted' as used in this instruction means an agreement by Ohmori on the purchase price, terms of payment, terms of shipment and other terms of sale in the purchase order." [6]

The evidence at trial showed that Fury customarily placed its orders with Omori through Shinei. Ciaccia, president of Fury, testified that some, but not all, of the orders were written. He said that he did place orders with Shinei for 150,000 reels in 1970, 1971, 1972, and 1973, *e. g.,* App. 683–86, and he produced what he said were all the orders that had been in writing. Mr. Kobayashi, president of Shinei, also testified that Fury ordered 150,000 reels from Omori through Shinei each year, that not all Fury's orders to Shinei were written, and that Shinei did not always pass these orders to Omori in written form. App. 906–07. In its special verdict, the jury specifically found that the contract had been extended in 1971, 1972, and 1973 by virtue of the fact that Fury had ordered at least 150,000 reels in each of those years. *See* note 4 *supra.*[7]

■ The district court overturned the jury's conclusion that the contract was in existence in the years 1971, 1972, and 1973 on the grounds that there was no documentary evidence that Fury had ordered 150,000 reels from Omori in those years, and that there was no documentary evidence that Omori had accepted such orders, as the court had defined "accepted" in its instructions. The court stated that "the absence of such records is persuasive," citing Fed. R.Ev. 803(7).[8]

We find defects in both grounds of the district court's holding. First, the question whether Fury did order 150,000 reels in each year remained one of fact for the jury, not the court, to decide. As we have said, both Ciaccia and Kobayashi testified that the required number of reels was ordered each year and that the orders were not always in written form. Fury could not be required to produce writings that never existed. *Cf.* Fed.R.Ev. 1005. While the absence of written orders might be a factor for the jury to take into account in deciding whether Ciaccia and Kobayashi were telling the truth, it does not prove conclusively that they were not. Insofar as the district court based judgment notwithstanding the verdict on a lack of evidence that Fury ordered 150,000 reels each year, it erred.

The second branch of the district court's holding relied on a lack of proof that Omori had accepted the orders in question by agreeing on the terms of the orders. Be-

---

6. It will be noted that the renewal clause of the contract contains no explicit requirement that Omori "accept" Fury's orders in the manner defined by the district court before the contract would be considered renewed. Fury has not argued to this court that the district court's construction of the contract was wrong in this respect, however. *See* Brief for Appellant at 20.

7. It will be noted that the special verdict form, unlike the district court's instructions, does not refer to a requirement that Omori "accept" Fury's orders for the contract to be considered renewed.

8. Rule 803(7) describes evidence admissible as an exception to the hearsay rule:

Evidence that a matter is not included in the memoranda, reports, records, or data compilations, in any form, kept in accordance with the provisions of paragraph (6) [making 'records of regularly conducted activity' admissible despite the hearsay rule], to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

cause there was no proof that Omori had agreed on the terms of the orders, the court held, there was no proof that the underlying contract had been renewed. There seem to us to be two problems with this holding.

First, Omori did, in fact, manufacture some reels for Fury in 1971, 1972, and 1973. Hence, it is plain that Omori and Fury *did* agree on the terms of an order for some number of reels. As we have seen, there was evidence from which the jury could have found that Fury ordered 150,000 reels each year. We think the jury could infer, from the facts that Fury ordered 150,000 reels and that Omori shipped some portion of that number, that Omori and Fury had agreed on terms to cover the entire order. The fact that Omori did not actually ship the number ordered does not necessarily mean that it did not agree to the terms of such an order.

Second, there was evidence in the record that the parties to the contract did not consider "acceptance" by Omori of Fury's entire order, as the court defined "acceptance," to be a prerequisite to renewal of the contract. The court instructed the jury that it could take the parties' own practices under the contract into account in determining the contract's meaning and in determining whether the contract had been modified by implication.[9] Thus, the jury might have concluded from the parties' conduct that the contract had been renewed for the years 1971, 1972, and 1973 by virtue of the fact that Fury had placed the required 150,000 order, even if it was not shown that Omori had "accepted" all the orders Fury placed.

The evidence from which the jury might so have concluded consists of Omori's own statements at the time it "cancelled" the contract. On June 8, 1973 Mr. Omori wrote Shinei as follows:

Gentlemen:

Concerning a contract signed between the notifying party and your company as well as American Fury on December 15, 1969 for the Diamond Spinmaster Fishing Reels, we had notified Mr. Akira Kobayashi, the president of your company and Mr. William Ciaccia, the president of the Fury Company on or about December 10, 1972 that we wished to cancel the above contract. We hereby confirm this notification of the cancellation of the contract in writing and as of this date. Under the above contract, it had been agreed that there would be a purchase of 150,000 units each year, but because we were not able to fulfill such an agreement, it has become necessary to cancel the contract.

App. 1165. Omori wrote Fury a similar letter the same day, although that letter attempted to cast blame on Fury for the termination of the contract. App. 1136. These letters carry an implication that Omori himself considered the contract to have been in effect up until he terminated it; for if the contract had not been in effect, there would have been no need to cancel it. In addition, it is undisputed that Omori did, in fact, produce reels for Fury in 1971, 1972, and 1973, although not in the quantity that Fury ordered. And finally, at no time during Mr. Omori's testimony at trial did he intimate that he did not consider the contract not to have been renewed for those years. From all this, we think the jury could have inferred that, in the minds

9. . . . I instruct you that words in a contract are to be construed according to their ordinary meaning where nothing appears to show that they were used in a different sense. However, words and phrases used in particular contracts are to be interpreted in accordance with the meaning ascribed to them by the parties.

Also most importantly, the practical conduct or practices of the parties under a contract is a consideration of much importance in ascertaining the meaning of terms of a contract and that consideration is entitled to great, if not controlling, influence in ascertaining the parties' understanding of the terms and language. This is so because the parties are in the best position to know what was intended by the language employed.

Also, even if the terms of a contract are clear and unambiguous, those terms may be subject to modification by implication from the acts of the parties.

App. 1007.

of the parties to the contract, the contract had been renewed each year. We therefore hold that the district court erred in granting judgment notwithstanding the verdict for Shakespeare on the ground that, because it was not shown Omori "accepted" the full order placed by Fury in the years in question, the contract was not still in effect.

B. *Justification or Privilege.* We also think the district court erred in granting judgment notwithstanding the verdict on the issue of justification or privilege. In its fullest discussion of the subject to date, the New York Court of Appeals has recognized the general rule that, "Procuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong." *Felsen v. Sol Cafe Manufacturing Corp.,* 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610, 613, 249 N.E.2d 459, 461 (1969), *quoting Knapp v. Penfield,* 143 Misc. 132, 134–35, 256 N.Y.S. 41 (Sup. Ct.1932). The cases finding privilege or justification, cited with approval in *Felsen,* include ones where the defendant and the plaintiff each had a contract with a third party, and the defendant induced the third party to breach its contract with the plaintiff, *e. g., Knapp v. Penfield, supra;* and cases where the defendant was a stockholder in a corporation, and the defendant induced the corporation to breach a contract with the plaintiff, *e. g., Morrison v. Frank,* 81 N.Y.S.2d 743 (Sup.Ct.1948). *Felsen* itself was the latter sort of case.

In both kinds of cases, an inducement to breach is privileged only if the defendant's purpose is to protect his own contractual or equity interest, upon which the privilege is based. *See, e. g., Felsen, supra,* 24 N.Y.2d at 687, 301 N.Y.S.2d 610, 249 N.E.2d 459;

10. § 769 of the Restatement states:
    One who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor
    (a) does not employ improper means, and
    (b) acts to protect his interest from being prejudiced by the relation.

*Knapp v. Penfield, supra,* 143 Misc. at 135, 256 N.Y.S. 41; *The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.,* 413 F.Supp. 555, 560 (S.D.N.Y.1976); Restatement of Torts § 679(b) & Comment b (1939).[10]

In this case, Shakespeare argues that it had two kinds of "existing economic interests" in Omori that justified its inducement to breach the Fury-Omori contract. First, it relies on its "permanent order" of reels from Omori, which predated Fury's contract with Omori, as creating a "contractor's privilege." Second, it relies on its purchase of one-sixth of Omori's stock and $200,000 interest free loan to Omori as creating an "owner's privilege" or "investor's privilege." In order to protect these "existing economic interests," Shakespeare tells us, it was privileged to induce Omori to breach its contract with Fury. The district court, recognizing the principle "that one who has a financial interest in the business of another is privileged to interfere with a contract between that business and a third person provided that the purpose is to protect its own interest," App. 55, accepted the argument.

The difficulty with the argument, to our minds, is that the jury had evidence before it from which it properly could have found that Shakespeare's purpose in inducing the breach was *not* to protect either its "permanent order" with, or its "ownership interest" in, Omori. It may be, as Shakespeare has argued throughout, that its purpose in buying equity in Omori and loaning it money was to prop up a failing supplier. But it is considerably less clear that requiring Omori to terminate a contract that accounted for thirty per cent of Omori's total production would go far toward strengthening

By its terms, the privilege stated in § 769 applies only to interference with noncontractual business relations, and not to inducements to breach an existing contract. *See* § 769, Comment d. It appears, however, that the New York courts also have applied this privilege to inducements to breach existing contracts. *See Morrison v. Frank, supra,* 81 N.Y.S.2d at 744.

Omori's financial position. The jury could have found from the record a belief on Shakespeare's part that Omori would fail, despite Shakespeare's purchase of stock and loan, without the Fury contract—unless Shakespeare mustered enough additional orders to take up the slack that would be left by the ouster of Fury. The jury also could have found that Shakespeare experienced considerable difficulty producing enough additional orders to keep Omori afloat, and that this was the reason Omori did not terminate its contract with Fury altogether until 1973. From all this, the jury could have concluded that Shakespeare's efforts to induce Omori to cut off supplies to Fury were in conflict with, and not in furtherance of, Sheakespeare's professed purpose of keeping Omori in business so it could continue to make reels for Shakespeare under Shakespeare's "permanent order."

At the same time, it is far from clear that Shakespeare's purpose in inducing the breach was to protect its ownership interest in Omori. The jury could have found, from the testimony of one of Shakespeare's own employees, that Shakespeare did not care whether Omori made any substantial profits. App. 168–69. The jury also could have found that Shakespeare wanted Omori to cut off Fury as soon as Shakespeare could place enough orders to keep Omori afloat, even if Omori could make more profit by also keeping the Fury business. From this, the jury could have concluded that Shakespeare's purpose in inducing the breach was not to protect or enhance its equity interest in Omori, but rather was in conflict with such a purpose.

The evidence from which the jury could have found that Shakespeare's purpose in inducing the breach was not to protect either its source of supply or its equity interest in Omori is buttressed greatly by a series of memoranda circulated among Shakespeare executives. These memoranda would support a finding that Shakespeare's purpose in inducing the breach was, in fact, to eliminate Fury as a competitor in the market to sell reels. For instance, on July 9, 1971 Bert Rost, managing director of Shakespeare's German subsidiary, wrote Ben Hardesty, vice-president for marketing of Shakespeare:

> The [Omori] factory is geared to make approx. 350,000 reels a year which is the minimum quantity for a moderately profitable operation. 500,000 could be made without any problems. As long as we cannot absorb the minimum quantity the factory has to produce to exist *we have to look for business from our competitors even if we do not like it. I am really trying hard to eliminate any other customer from the Omori factory but I am afraid it might take another year*
>
> . . . .
>
> . . . If you come to the conclusion that Mr. Omori should not make reels any more for somebody else please get in touch with Mr. Watanuki [the Shakespeare representative on Omori's board of directors] by phone or telex. *I have the feeling that there is still time to stop the order from Fury.* By doing this we commit ourselves for feeding the Omori company with sufficient orders and permitting them to ship the production right away or give financial help.

App. 1028 (emphasis added). On February 28, 1972 Rost wrote Hardesty:

> Let's hope our sales will continue to be good and will finally reach a volume which enables us to absorb Omori's full capacity *to eliminate supplies to the one other outlet left to Omori* [i. e., Fury] . . . *I think both, Clyde* [Rickard of Shakespeare's marketing division] *and Dick* [?] *would feel much better if we could cut off FURY from Omori.*

App. 1046–47 (emphasis added). On April 13, 1972 Rost wrote Hardesty:

> . . . Mr. Omori was approached by Shinei (Fury's Japanese broker) to accept a fresh order for more than 100,000 reels . . . Mr. Omori rejected but, if I understood correctly, left it open to accept the order if the reels can be produced and shipped from July and September

as last year. During this period last year he had no orders from us and was more than happy to receive the Fury order at all. *If we want to get Fury out already this year, immediate action must be taken.* I consider the risk very small even though I am afraid 180,000 reels for Europe is a lot but feel almost certain Clyde might be able to sell additionally in the States what we will miss out. *Isn't there a good chance for Clyde to get the larger part of the Fury business if we cut them off smartly?*

App. 1054 (emphasis added). On April 17, 1972 Rickard wrote Hardesty:

. . . I am in a position to commit the Shakespeare Marketing Division for 185,-000 Omori manufactured reels . . . . *I cannot commit for this quantity if we continue to allow Omori to manufacture reels for Fury. Fury has, as you know, a look alike reel to our import and they have caused us a tremendous amount of problems in the market place due to their pricing.*

App. 1049 (emphasis added). And at about the same time, Rickard telexed to Rost:

*[I] can no longer live with [O]mori manufacturing reels for [F]ury . . . . [S]o lets make the move and get [F]ury out. [I]t will save us a lot of heartaches in the states.*

App. 1056 (emphasis added). Finally, there was evidence that after Omori quit making Spinmaster reels for Fury, it made the identical reel for Shakespeare, App. 504, as the June 10, 1970 agreement between Shakespeare and Omori appears to have contemplated, *see* text and note at note 2 *supra.* We think this evidence, together with that reviewed above, would support a jury finding that Shakespeare's sole purpose in inducing Omori to cut off Fury was to eliminate a competitor in the market to sell reels, and not to preserve Omori as a source of supply or as an investment. If that were the case, Shakespeare would have no valid claim of privilege.

To be sure, Shakespeare argued below, as it has argued here, that it *was* necessary to cut off Fury in order to save Omori, because of what it says were lapses on Fury's part in dealing with Omori. But whether that was true also was for the jury to decide. We therefore hold that the district court erred in granting Shakespeare judgment notwithstanding the verdict on the issue of privilege.

## III. COMPENSATORY DAMAGES.

To prove actual damages caused by the breach induced by Shakespeare, Fury introduced the testimony of its accountant. Fury sold five different models of reels produced by Omori. The accountant testified that he had taken a random sample of Fury's purchase and sales invoices for each year in which damages were claimed. From this sample, he determined the average cost to Fury for each model of reel each year, and the average price that Fury sold each model for each year. By subtracting the former from the latter, he determined the difference each year between the average cost to Fury and the average price that Fury sold each model for. He then determined the average of the five models' averages to arrive at the overall average difference, for all five models, between cost and sales price each year. This figure was meant to represent the average gross profit per reel to Fury each year, for the five models combined.[11] The accountant testified that this method for determining the

---

11. The accountant used 1971 figures to give an example of his method. In that year, he said, the average cost to Fury for Model No. 1 was $3.34; No. 2, $3.60; No. 3, $4.10; No. 4, $4.52; and No. 5, $5.05. App. 803–04. In the same year he said, Fury's average selling price for Model No. 1 was $5.08; No. 2, $5.52; No. 3, $5.99; No. 4, $6.06; and No. 5, $7.40. App. 804. The difference between the average cost and average selling price for each model, then, was as follows:

|  | No. 1 | No. 2 | No. 3 | No. 4 | No. 5 |
|---|---|---|---|---|---|
| Selling price | $5.08 | $5.52 | $5.99 | $6.06 | $7.40 |
| Cost | −3.34 | −3.60 | −4.10 | −4.52 | −5.05 |
| Difference | $1.74 | $1.92 | $1.89 | $1.54 | $2.35 |

The accountant then took a simple average of these five figures, which he said came to $1.97. By our calculation, it comes to about $1.89. The defendant, however, has not complained of this apparent discrepancy.

average gross profit represented standard accounting procedure. App. 795–96.

The accountant was permitted to testify from his summaries, which had been made available to the defendant along with the records underlying them, as to what this average was for each of the five years in question.[12] He also was permitted to testify as to the difference between the number of reels actually received and sold by Fury each year, and the 150,000 that Fury supposedly had ordered from Omori each year.[13] The accountant agreed that increased expenses that would accompany increased sales should be deducted from gross profits to arrive at net profits, but he assigned no figures for how much expenses would have increased.

In final argument to the jury, Fury's counsel requested, as actual damages, an amount equal to the number of reels that Omori should have supplied, but did not, times the average gross profit per reel, for each of the five years in question.[14] The assumption, for which there was support in the evidence, was that Fury could have sold 150,000 reels each year if Omori had shipped that many. Fury's counsel told the jury that it should reduce these figures by whatever amount of expense it thought should be attributed to the lost sales, based on expense figures appearing in Fury's profit-and-loss statements that were in evidence. He contended, though, that this amount would not be great. App. 989.

The special verdict form given to the jury called for it to enter a separate figure for actual damages for each year in question.

The figures requested by Fury, and those awarded by the jury, compare as follows:

|  | Requested | Awarded |
|---|---|---|
| 1970 | $9,327.24 | $35,278.88 |
| 1971 | $151,957.92 | $42,376.67 |
| 1972 | $412,106.16 | $206,818.92 |
| 1973 | $331,286.04 | $432,523.20 |
| 1974 | $738,000.00 | $563,319.68 |
| Total | $1,642,677.36 | $1,271,317.35 |

It will be noted that for the year 1970, the jury awarded about $26,000 more than Fury had requested; and for 1973, it awarded about $101,000 more than Fury had requested. Its total award, however, was less than the total requested by Fury.

As we read the district court's opinion, it found three weaknesses in the proof and verdict on actual damages. First, it objected to the method the accountant used to arrive at the average gross profit per reel for each year, because that method did not take into account the number of reels of each model that were sold. That is, because the gross profit per reel varied from model to model, the court thought the average gross profit per reel for the five models combined should have been weighted to take into account how many reels of each model were sold. Second, the court thought the accountant's testimony as to lost profits was deficient because it did not take into account increased operating expenses that would accompany increased sales, and that should be subtracted from lost gross profits to arrive at lost net profits. And finally, the court thought the discrepancy for the years 1970 and 1973 between the amount Fury had requested and the amount the jury had awarded demonstrated that the jury had gone outside the evidence or had simply become confused. We agree, in gen-

---

12. The figures for each year were as follows, App. 801–07:

| 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| $ .26 | $1.97 | $3.14 | $2.91 | $4.92 |

13. The figures for each year were, App. 802–08:

| 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| 35,874 | 77,136 | 131,244 | 113,844 | 150,000 |

14. Relying on the figures set out in notes 12 and 13 *supra,* he requested:

| 1970 | 1971 | 1972 |
|---|---|---|
| 35,874 | 77,136 | 131,244 |
| x $ .26 | x $1.97 | x $3.14 |
| $9,327.24 | $151,957.92 | $412,106.16 |

| 1973 | 1974 |
|---|---|
| 113,844 | 150,000 |
| x $2.91 | x $ .92 |
| $331,286.04 | $738,000.00 |

eral, with the second and third points made by the district court, and hold that a new trial is required.

■ A. *The Accountant's Method of Estimating Gross Lost Profits.* We agree with Shakespeare that Fury was required to prove the amount of its damages with a reasonable degree of specificity. We disagree, however, that the accountant's method of calculating lost gross profits was so lacking in probative value as to preclude an award based on his estimate.

As Judge Ainsworth recently had occasion to explain, "[T]he issue is whether the probative value of the expert's testimony was so slight that it should not have been submitted to the jury. [cite] A jury's award of damages . . . may have adequate support in the evidence even though an expert's assumptions and methodology may not have been the only permissible ones for determining damages." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 999 (5th Cir. 1976). In this case, the district court admitted the accountant's testimony over defendant's objection based on the method of calculation, stating, "We have an expert on the stand and I think he is subject to your cross examination. I am going to let him testify about the averages. And of course, you have an expert here listening, by the way." App. 796. We think the district court's first impulse was correct. While it appears that the estimate of lost gross profits might have varied if the accountant had performed the operation contended for by the defendant, the accountant testified that his method was an accepted one. The defendant has not attempted to show that this is not true, either below or in this court. Moreover, it was open to the defendant, to whom the records upon which the accountant based his testimony had been made available, to contradict the estimate with expert testimony and calculations of its

own. In these circumstances, we cannot say that the probative value of the accountant's testimony was so slight that it should not have been submitted to the jury.

■ B. *Proof of Net Lost Profits.* The district court's second point is well taken. Fury concedes that it was entitled only to net, not gross, lost profits. Yet it made only the most perfunctory gesture toward presenting the jury with a basis for estimating how much its expenses would have increased if Omori had delivered 150,000 reels per year.[15] Ciaccia testified that expenses connected with Fury's sale of reels would have included the cost of traveling expenses, printing catalogs and price lists, booking orders, opening letters of credit, warehouse insurance, and sales commissions; but at no point did he make even a rough estimate as to the magnitude of these expenses. App. 757–63. The accountant testified in similarly general fashion. App. 843–48. The only evidence from which the jury might have begun to guess how much Fury's expenses would have increased were Fury's profit-and-loss statements for 1970, 1971, and 1973, which show the expenses actually incurred by Fury for those years. App. 1128, 1131, 1135. But the jury was given no basis on which it could have extrapolated from these historical figures to decide how much Fury's expenses would have *increased,* if more reels had been delivered. In short, there was simply no evidence at all as to net, as distinguished from gross, profits. *See Cook Industries, Inc. v. Carlson,* 334 F.Supp. 809, 816–17 (N.D.Miss.1971).

In these circumstances, we ordinarily would reverse and remand for a new trial limited to the issue of damages. *See, e. g., Nat Harrison Associates, Inc. v. Gulf States Utilities Co.,* 491 F.2d 578, 588 (5th Cir. 1974). In this case, however, "the question of damages . . . is so interwoven with that of liability that the former cannot

---

**15.** Although they argued the point below, neither party has taken a clear position in this court on whether a portion of the expenses that would *not* have varied with increased sales also should be subtracted from gross lost profits to arrive at net lost profits. *See generally* Annot., 3 A.L.R.3d 689 (1965). We therefore express no opinion on this question.

be submitted to the jury without confusion and uncertainty, which would amount to a denial of a fair trial." *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *see, e. g., Howell v. Marmpegaso Compania Naviera, S. A.,* 536 F.2d 1032, 1035 (5th Cir. 1976); *Korbut v. Keystone Shipping Co.,* 380 F.2d 352, 354 (5th Cir. 1967). This is so because, among other reasons, the question of causation is so intimately tied to the question of damages.[16] Moreover, as the district court correctly pointed out, the jury's verdict on damages at the first trial suggests some rather fundamental confusion, the source of which is impossible to trace.[17] In these circumstances, we hold that the interests of justice require a new trial on issue of liability as well as damages.

## IV. PUNITIVE DAMAGES.

The district court instructed the jury that if it found Fury was entitled to compensatory damages, and if it further found

> that the act or omission of the defendant, which proximately caused actual injury or damage to the plaintiff, was maliciously, or wantonly, or oppressively done; then the jury may, if in the exercise of discretion they unanimously choose so to do, add to the award of actual damages such amount as the jury shall unanimously agree to be proper, as punitive and exemplary damages.
>
> An act or failure to act is 'wantonly' done, if done in reckless or callous disregard of, or indifference to, the rights of one or more persons, including the injured person.

App. 1015. The court instructed the jury to bear in mind that the purpose of punitive damages is "to punish the wrongdoer for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct." App. 1014, 1016. The jury found in its special verdict that Shakespeare was guilty of "wanton, willful misconduct" in inducing the breach, and it awarded substantial punitive damages.

■ The district court, stating that under New York law punitive damages may be recovered "where the wrong complained of is morally culpable, or . . . actuated by evil and reprehensible motives or a desire to harm the plaintiff, or where an act is so reckless that its carelessness indicates a heedless disregard of the rights of others," App. 60, nonetheless overturned the jury's verdict. On the evidence in this case, we think this was error.

The New York Court of Appeals has recognized that it "may be difficult to formulate an all-inclusive rule or principle as to what is an appropriate case for the recovery of punitive damages." *Walker v. Sheldon,* 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 492, 179 N.E.2d 497, 499 (1961). As the district court correctly noted, the New York courts have allowed punitive damages "where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives," *Walker v. Sheldon, supra,* 10 N.Y.2d at 404, 223 N.Y.S.2d at 490, 179 N.E.2d at 498, and where a tort "was committed recklessly or wantonly, i. e., without regard to the rights of the plaintiff, or of people in general," *Soucy v. Greyhound Corp.,* 27 A.D.2d 112, 113, 276 N.Y.S.2d 173, 175 (1967), *quoting Magagnos v. Brooklyn Heights R. R. Co.,* 128 App.Div. 182, 183, 112 N.Y.S. 637 (1908); *accord, e. g., Hamilton v. Third Ave. R. R. Co.,* 53 N.Y. 25, 30

---

**16.** Shakespeare can be held liable only for those breaches by Omori that it induced. This is a substantial point on the facts of this case. For instance, there was evidence that Omori was in financial trouble in 1969–70, which might have affected its capacity to produce reels. In addition, it is possible that Omori breached the contract in part even before it entered the agreement with Shakespeare under which it agreed to stop dealing with Fury.

**17.** At the retrial, if the district court again uses a special verdict, it might consider Fury's complaint that it is asking too much of a jury to keep track of five years' worth of damage calculations without the benefit of pencil and paper.

(1873); *Hayes v. State of New York,* 80 Misc.2d 498, 506, 363 N.Y.S.2d 986 (Ct. Claims), *rev'd on other grounds,* 50 A.D.2d 693, 376 N.Y.S.2d 647 (1975); *Da Costa v. Technico Construction Corp.,* 74 Misc.2d 583, 584, 344 N.Y.S.2d 967 (Civ.Ct.N.Y.C.1973), *aff'd,* 78 Misc.2d 1100, 360 N.Y.S.2d 846 (Sup.Ct.1974). Moreover, "The list of actions in which punitive damages have been permitted in [New York] is long . . . for . . . ., 'It is not the form of action that gives the right to the jury to give punitory damages, but the moral culpability of the defendant.'" *Walker v. Sheldon, supra,* 10 N.Y.2d at 404–05, 223 N.Y.S.2d at 490, 179 N.E.2d at 498; *quoting Hamilton v. Third Ave. R. R. Co., supra,* 53 N.Y. at 30.

In this case there was evidence from which the jury could have found that the defendant set out deliberately to destroy plaintiff's business, and to take that business for its own. The jury also could have found that to accomplish this end, defendant's executives, over a period of years, consistently acted with complete disregard for known contractual rights of the plaintiff. Although we cannot be certain what the New York courts would do in a case like this, we do know that federal courts applying very similar law from other states have found the evidence sufficient to support awards of punitive damages in very similar inducement-to-breach cases. *Hannigan v. Sears, Roebuck and Co.,* 410 F.2d 285, 293–94 (7th Cir.), *cert. denied,* 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969); *ABC–Paramount Records, Inc. v. Topps Record Distributing Co.,* 374 F.2d 455, 462–63 (5th Cir. 1967). We think the same result should obtain under New York law here.[18]

Although we hold that the district court erred in setting aside the jury verdict as to punitive damages, we also hold that this issue must, in the interest of justice, be retried with the other issues. Plaintiff is

entitled to no punitive damages unless the jury finds for it on liability and awards some actual damages. Moreover, an award of punitive damages should rest on the jury's assessment of all the evidence in the case. Hence, the issue of punitive damages is so intertwined with the other issues that it should be retried with them. *See* Part III.B. *supra.*

■ We also hold that evidence of defendant's wealth is admissible on the issue of the amount of punitive damages. *Rupert v. Sellers,* 48 A.D.2d 265, 269–272, 368 N.Y.S.2d 904 (App.Div.1975). It appears that no issue was raised below as to whether a federal court applying New York law should follow the procedure recommended in *Rupert* of not submitting such evidence to the jury until after the jury finds that the defendant is liable for punitive damages. We therefore express no opinion on this question.

## V. STATUTE OF LIMITATIONS.

Shakespeare argues that the district court erred in holding Fury's cause of action was not barred by the appropriate statute of limitations. This argument consists of three basic components: first, that the district court erred in holding that Florida's four year statute, rather than New York's three year statute, applied; second, that the cause of action accrued more than three years before Fury filed suit; and third, that the statute was not tolled for any reason.

Because the case must be remanded for a new trial anyway, and because the statute of limitations question may raise issues that were not considered at the first trial, we do not think we should pass on these questions at this time. Specifically, it does not appear from the record whether the district court took into account Florida's "borrowing" statute, F.S.A. § 95.10, in deciding to

---

**18.** We do not think, as the district court may have thought, *see* App. 60, that the fact that defendant may have acted with the motive of gaining greater profits would change the result. *See Walker v. Sheldon, supra,* 10 N.Y.2d at 406, 223 N.Y.S.2d 488, 179 N.E.2d 497.

apply the four year statute of limitations of F.S.A. § 95.11. Shakespeare argues here that the cause of action "arose" in New York, and that Florida therefore would "borrow" the three year New York statute of limitation, N.Y.Civ.Prac. § 214(4) (McKinney).[19] We cannot say on the record before us where the cause of action "arose," and think this point should be considered in the first instance, if it has not been already, by the court below.

If the district court were to decide that the New York statute of limitations should have been applied, it will, of course, have to decide when Fury's cause of action accrued under New York law, and whether any reason exists for tolling the statute. Although the parties address much argument to us on these issues, we think it would be premature to pass on them at this point. This is especially so because there may well be issues of fact upon which a jury should pass as to just when the first breach occurred, and whether fraudulent concealment occurred. *See* Brief for Appellants at 26–28. We therefore do not rule on these issues. We find it unnecessary to rule on any of the other issues raised by the parties.

REVERSED.

---

**19.** Shakespeare also argues that the district court erred in holding that the parties' informal stipulation that New York law would apply was not intended to extend to the statute of limitations question. The district court, of course, was not bound to follow a stipulation as to a question of law. *Equitable Life Assurance Soc'y v. MacGill,* 551 F.2d 978, 983 (5th Cir. 1977). Moreover, as the district court stated, "The vagueness of the stipulation combined with the failure of the defendant to clearly advance its conflicts-of-law position have posed some needless problems throughout the trial, and post-trial stages." App. 56, n. 3. In these circumstances, we will not disturb the district court's interpretation of the stipulation.